**William F. SCHELL,
Plaintiff–Appellant,**

v.

**UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, et al., Defendants–Appellees.**

No. 86–2146.

United States Court of Appeals,
Sixth Circuit.

Decided April 1, 1988.

William F. Schell (argued), Holt, Mich., pro se.

Daniel M. LaVille, Asst. U.S. Atty., Grand Rapids, Mich., Barbara F. Altman (argued), Asst. Regional Atty., Dept. of HHS, Chicago, Ill., for defendants-appellees.

Before NELSON and BOGGS, Circuit Judges; and EDWARDS, Senior Circuit Judge.

BOGGS, Circuit Judge.

William F. Schell appeals the district court's decision denying his request under the Freedom of Information Act, 5 U.S.C. § 552 (1982), for disclosure of a memorandum prepared by the administrative law

judges in the Lansing, Michigan field office of the Office of Hearings and Appeals, Social Security Administration. We affirm.

## I

The essential facts are largely undisputed. Schell is an attorney-advisor with the Lansing, Michigan field office of the Office of Hearings and Appeals (OHA), Social Security Administration. His duties include providing legal advice and professional assistance, including legal research and writing, to the administrative law judges in the Lansing office and in the Chicago region.

In 1985, the OHA instituted a nationwide program called "Pursuing Excellence through Participation" (PEP), which was designed to "increase employee involvement in setting the agency's goals for the coming year." The program invited employees to develop and implement a "participatory planning process" within the OHA to increase their involvement in agency decisionmaking. The PEP manual described the planning process as follows:

> The first essential element is developing your unit's mission statement, which describes your unit's reason for existence and includes the nature and scope of work to be performed. The next step in planning is identifying goals, which contribute to the accomplishment of your unit's mission. Hand-in-hand with identifying goals is the need to develop action steps for accomplishing those goals. Once the plan has been implemented, a progress assessment phase begins that measures progress made at prescheduled intervals toward achieving your goals. The final phase of the planning process asks you to identify possible solutions to problems, which impact on your unit but over which you have no control.

Robert Hull, an ALJ in the Lansing office, called a meeting to notify the employees about the program. He indicated that the ALJs in the office had decided not to participate, but others would be afforded an opportunity to do so.

Several employees decided to participate in the PEP program. This group was composed of two attorney-advisors, two hearing analysts, and the supervisory attorney-advisor for the field office. At the first meeting in March 1985, Schell was elected the leader of the group. It met over the next few months to develop a PEP plan, which Schell presented to Judge Hull.

In Initiative "s" of their plan, the PEP group recommended that government representatives be assigned permanently in all OHA offices "to insure that the Administration guidelines are followed [and] cases are more correctly decided." This was necessary, according to the group, because the "ALJ's [sic] run roughshod, unchecked over claimants and Administration, making decisions which ignore established regulations & rulings & the facts of the particular cases." In assessing the value of this initiative, the group stated: "Great Monetary savings for the Administration in that the current 'liberal' outlook of current ALJ corps in paying benefits to those not deserving would be tempered. In the same vein, more correct decisions would bring greater trust in the Administration (Gov't) from the public."

Schell alleges that Judge Hull improperly routed the PEP recommendations to the ALJs in the Lansing office. As a result, he contends, some of the ALJs stopped speaking to him and "refused to provide work to members of the group" for most of May and June 1985.

Shortly thereafter, Schell received a visit from Norman Wallace, Regional Deputy Management Officer of the OHA, concerning the group's recommendations. Wallace told Schell that the ALJs were "furious" about Initiative "s" and had written a response. The ALJ memorandum disagreed (to put it mildly) with the Schell group, gave reasons opposing the suggested policy changes, and made recommendations as to the procedures that should be followed by the Lansing office. The memorandum was addressed to the Associate Commissioner of the OHA; copies were sent to the Chief Administrative Law Judge and the Regional Chief Administrative Law Judge.

Wallace denied Schell's request for the memorandum, but suggested he could gain

access to it under the Freedom of Information Act (FOIA). In order to "defuse the situation," Wallace asked the group to consider modifying the language of Initiative "s," which they did. He assured Schell that no member of the group would be disciplined for the PEP recommendations.[1]

On June 5, 1985, Schell filed a FOIA request with the agency. John Percy, FOIA officer for the Social Security Administration, denied the request pursuant to Exemption 5, which exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than the agency in litigation with the agency." 5 U.S.C. § 552(b)(5) (1982). In his letter, he said: "Release of this material would be harmful to the quality of the decision-making process of the agency as it may have a chilling effect on frank and open discussion among agency personnel in formulating a position or policy." On appeal, Louis D. Enoff, Acting Deputy Commissioner for Programs and Policy, OHA, upheld Percy's decision to deny Schell's FOIA request. Enoff cited Exemption 5 and Exemption 6 in support of his decision. Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6) (1982).

After exhausting his administrative remedies, Schell filed the instant action. The district court granted summary judgment for the agency, relying exclusively on Exemption 6. Instead of reviewing the four-page memorandum *in camera*, the court relied on the affidavit submitted by FOIA officer Percy, which read in pertinent part:

> The memorandum was written in response to certain allegations made by the attorney-advisors and hearing analysts in the Lansing, Michigan office of OHA to the Regional Chief Administrative Law Judge about the signatory administrative law judges. The memorandum is devoid of factual matter but rather expresses the thoughts, opinions, and attitudes of the writers, concluding with a recommendation that certain action be taken. The writers freely and frankly discuss perceived problems and potential problems of interpersonal relations in the Lansing, Michigan office of OHA and suggest alternative courses of action to alleviate these perceived problems and potential problems.

> To my knowledge, no action has been taken by OHA management in response to the subject memorandum. I believe that disclosure of the memorandum would stifle open communication between administrative law judges in field offices and national (and regional) management concerning the broad range of personnel matters. I further believe that disclosure of the personal and subjective thoughts expressed by the signatories could embarrass these administrative law judges and subject them to ridicule and criticism. Conversely, disclosure would serve no conceivable public interest since the memorandum deals exclusively with personnel matters and interpersonal relations among employees of OHA.

Based on this information, the district court ruled that the memorandum constituted a "similar" file, disclosure of which would be a "clearly unwarranted invasion of personal privacy."

After reviewing *in camera* the ALJ memorandum, we hold that the document is exempt from disclosure under Exemption 5. Accordingly, we affirm the decision of the district court.

## II

The Freedom of Information Act, 5 U.S.C. § 552 (1982), was enacted "to permit access to official information long shielded unnecessarily from public view and ... to create a judicially enforceable public right to secure such information from possibly unwilling official hands." *EPA v. Mink*, 410 U.S. 73, 80, 93 S.Ct. 827, 832, 35 L.Ed.

---

1. In August 1985, Schell received a visit from Kenneth Stewart, Regional Chief Administrative Law Judge. Echoing Wallace's statements, Judge Stewart indicated that the ALJs were "very upset" by Initiative "s," but no disciplinary action would be taken as a result.

2d 119 (1973). The Act seeks to ensure that government officials are held accountable to an informed electorate. *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 243, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978). "Disclosure, not secrecy, is the dominant objective of the Act." *Department of Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976).

Yet, Congress understood that government could not function effectively if public access were granted indiscriminately. "To permit disclosure of certain types of information could impair the effective performance of vital governmental functions and threaten the well-being of individual citizens by unnecessarily revealing information of a personal nature." *Madeira Nursing Center, Inc. v. NLRB*, 615 F.2d 728, 730 (6th Cir.1980) (citing S.Rep. No. 813, 89th Cong., 1st Sess. 6 (1965)). Congress sought a workable balance between the right of the public to be informed and the need of the government to keep sensitive information in confidence to the extent necessary to permit a democracy to function. H.R.Rep. No. 1497, 89th Cong., 2d Sess. 6, *reprinted in* 1966 U.S.Code Cong. & Admin.News 2418, 2423.

■ Congress achieved this balance by providing nine statutory exemptions from disclosure. 5 U.S.C. § 552(b) (1982). In keeping with the philosophy of disclosure, however, these exemptions are "narrowly construed," *Rose*, 425 U.S. at 361, 96 S.Ct. at 1599, and the government has the burden of establishing that one of them applies. *Mink*, 410 U.S. at 92, 93 S.Ct. at 838; *Multnomah County Medical Society v. Scott*, 825 F.2d 1410, 1413 (9th Cir.1987).

### III. EXEMPTION 6

#### A

Exemption 6 permits withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6) (1982). This exemption focuses on information of a personal nature, which is inevitably contained in personnel and medical files. Recognizing that such information might be found in other files as well, Congress also exempted from disclosure such information contained in "similar files." Congress's purpose in enacting Exemption 6 was to protect individuals from the harm that could result from the unnecessary public dissemination of personal information. *United States Department of State v. Washington Post Co.*, 456 U.S. 595, 599, 102 S.Ct. 1957, 1960, 72 L.Ed.2d 358 (1982) (relying on H.R.Rep. No. 1497, 89th Cong., 2d Sess. 11, *reprinted in* 1966 U.S.Code Cong. & Admin.News 2418, 2428). *See also Rose*, 425 U.S. at 375 n. 14, 96 S.Ct. at 1606 n. 14 (purpose of Exemption 6 is to "provide for the confidentiality of personal matters").

The language of Exemption 6 requires a two-part inquiry: 1) does the file contain personnel, medical or "similar" data; and 2) if so, would disclosure be a "clearly unwarranted invasion of personal privacy." *Heights Community Congress v. Veterans Administration*, 732 F.2d 526, 528 (6th Cir.), *cert. denied*, 469 U.S. 1034, 105 S.Ct. 506, 83 L.Ed.2d 398 (1984). *See also Washington Post*, 456 U.S. at 601–02, 102 S.Ct. at 1961–62.

In *Washington Post*, 456 U.S. at 600, 102 S.Ct. at 1960, the Supreme Court ruled that the phrase "similar files" was to have a broad, rather than a narrow, meaning. The Court rejected the contention that "similar files" should cover only highly personal or intimate matters; that is, "a narrow class of files containing only a discrete kind of personal information." *Id.* at 602, 102 S.Ct. at 1961. Concluding that citizenship information fell within this category, the Court said that the term "similar files" was " 'intended to cover detailed Government records on an individual which can be identified as applying to that individual.' " *Ibid.* (quoting H.R.Rep. No. 1497, 89th Cong., 2d Sess. 11, *reprinted in* 1966 U.S. Code Cong. & Admin.News 2418, 2428).

Once this threshold requirement has been met, courts must determine whether release of the information would constitute a clearly unwarranted invasion of personal

privacy. This requires a balancing of interests "between the protection of an individual's private affairs from unnecessary public scrutiny, and the preservation of the public's right to governmental information." S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965). In striking this balance, this court looks to two factors: the privacy interest at stake and the public interest in disclosure. *Heights Community Congress*, 732 F.2d at 529. *See also Madeira Nursing Center*, 615 F.2d at 730 ("The central inquiry is whether public access to the information ... is tantamount to an invasion of privacy; if so, we ask whether such an invasion is justified by any countervailing public benefit from disclosure."). Taking our cue from other circuits, we have also found relevant whether other sources of information might suffice. *Heights Community Congress*, 732 F.2d at 529.[2]

## B

The district court found that the memorandum constituted a "similar" file because it "can be identified as applying to particular individuals, *i.e.*, the ALJs who prepared the memorandum...." The lower court's analysis suggests that the document will fall within the scope of the privacy exemption merely because the author signed it. We are not wholly confident that such a conclusion is dictated by *Washington Post*, although we need not resolve that issue here.

■ The court also said that the memorandum was a "similar" file because other individuals were referenced in it. There is no support for this conclusion in the FOIA affidavit, which the district court had before it. We require the district court to have an "adequate factual basis" for its

decision. *Ingle v. Department of Justice*, 698 F.2d 259, 267 (6th Cir.1983).

Even if this threshold requirement has been satisfied, we still have doubts about the court's conclusion that disclosure of the document would constitute a clearly unwarranted invasion of personal privacy. With respect to the privacy interest, the district court said:

Mr. Percy's affidavit indicates that the memorandum concerns sensitive matters of inter-personal relations within the OHA's Lansing Office. Such matters often are highly personal in nature and not a proper subject for public disclosure.

Again, the district court did not hold the agency to its burden of supplying specific and detailed information necessary to support withholding the requested document. Instead, the court accepted at face value the conclusory assertions in the FOIA affidavit.

■ With the benefit of *in camera* review, we are unable to say that the district court was correct on this score. While the memorandum does contain "thoughts, opinions, and attitudes" of the authors, as stated by the FOIA officer, it does not contain any personal information about particular individuals. Nor does it contain any information related to specific charges of misconduct or turpitude, as were involved in *Iglesias v. CIA*, 525 F.Supp. 547, 561 (D.D.C.1981)[3] and *Carter v. United States Department of Commerce*, 830 F.2d 388, 390 n. 6 (D.C.Cir.1987).

We are not persuaded by the government's assertion that there is a clearly unwarranted invasion of personal privacy because the document contains "subjective thoughts and opinions" which, if disclosed, may invite ridicule or cause embarrassment. Most bureaucratic documents can

---

2. Some courts also look to a particular plaintiff's interest in disclosure. *See, e.g., Multnomah County Medical Society*, 825 F.2d at 1413. Several circuits have indicated that this is unwarranted. *See, e.g., Aronson v. United States Department of Housing and Urban Development*, 822 F.2d 182, 185–86 (1st Cir.1987) (citation omitted) ("The rights of a party seeking disclosure 'are not lessened, any more than they are enhanced, by the private purpose for which the documents are sought.'").

3. In *Iglesias*, the requested documents, a letter and drafts thereof in response to certain allegations of misconduct, contained the author's "interpretation of the facts and circumstances of the alleged misconduct." 525 F.Supp. at 561. There is nothing of this sort in the document we have before us.

generate some sort of criticism, and many will expose their authors to justifiable ridicule. Such documents may be exactly the ones intended to be exposed by FOIA. But that possibility does not necessarily mean that the document will "clearly" invade personal privacy. This would unduly expand the coverage of Exemption 6 in violation of the oft-repeated rule that FOIA exemptions should be construed narrowly. *Rose,* 425 U.S. at 361, 96 S.Ct. at 1599. Without more, the disclosure of a document will not constitute a clearly unwarranted invasion of personal privacy simply because it would invite a negative reaction or cause embarrassment in the sense that a position is thought by others to be wrong or inadequate.

We find it unnecessary to decide the applicability of Exemption 6 with any great surety, however. As we indicate below, our *in camera* review reveals that the ALJ memorandum is exempt from disclosure under Exemption 5.

## IV. EXEMPTION 5

### A

Exemption 5 allows withholding of "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5) (1982). This language contemplates that the public will not be entitled to government documents which a private party could not discover in litigation with the agency. *United States v. Weber Aircraft Corp.,* 465 U.S. 792, 799–800, 104 S.Ct. 1488, 1492–93, 79 L.Ed.2d 814 (1984); *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 148, 95 S.Ct. 1504, 1515, 44 L.Ed.2d 29 (1975). Exemption 5 has been interpreted as preserving to the agencies such recognized evidentiary privileges as the attorney-client privilege, the attorney work-product privilege, and the executive "deliberative process" privilege. *Parke, Davis & Co. v. Califano,* 623 F.2d 1, 5 (6th Cir.

1980). The latter privilege is at issue in the present case.

The primary purpose served by the deliberative process privilege is to encourage candid communications between subordinates and superiors.

> [I]t serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

*Coastal States Gas Corp. v. Department of Energy,* 617 F.2d 854, 866 (D.C.Cir. 1980). The ultimate goal that Exemption 5 seeks to achieve is to prevent the quality of agency decisionmaking from deteriorating as a result of public exposure. *Sears, Roebuck & Co.,* 421 U.S. at 151, 95 S.Ct. at 1516.

These concerns are reflected in the legislative history of Exemption 5. According to the House Report,

> Agency witnesses argued that a full and frank exchange of opinions would be impossible if all internal communications were made public. They contended, and with merit, that advice from staff assistants and the exchange of ideas among agency personnel would not be completely frank if they were forced to "operate in a fishbowl." Moreover, a Government agency cannot always operate effectively if it is required to disclose documents or information which it has received or generated before it completes the process of awarding a contract or issuing an order, decision or regulation.

H.R.Rep. No. 1497, 89th Cong., 2d Sess. 10, *reprinted in* 1966 U.S.Code Cong. & Admin.News 2418, 2427–28. *See also* S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965).[4]

---

**4.** According to the Senate Report, Exemption 5 is to be construed as "narrowly as consistent

with efficient Government operation." S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965).

**940**

To come within Exemption 5, a government document must be both "predecisional" and "deliberative." *Parke, Davis & Co.*, 623 F.2d at 6. A document is predecisional when it is "received by the decisionmaker on the subject of the decision prior to the time the decision is made," *Sears, Roebuck & Co.*, 421 U.S. at 151, 95 S.Ct. at 1517; and deliberative when it "reflects the give-and-take of the consultative process." *Coastal States Gas Corp.*, 617 F.2d at 866. *See Parke, Davis & Co.*, 623 F.2d at 6 ("The district court must know how each document fits into the deliberative process, and whether it is an essential element of that process or possibly a peripheral item which just 'beefs up' a position with cumulative materials."). "The exemption thus covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States Gas Corp.*, 617 F.2d at 866.

In its early discussion of the deliberative process privilege, the Supreme Court indicated that Exemption 5 would protect advisory materials which truly reflected the deliberative or policymaking processes of an agency, but would not protect "purely factual, investigative" material. *EPA v. Mink*, 410 U.S. 73, 89, 93 S.Ct. 827, 837, 35 L.Ed.2d 119 (1973). This fact-opinion distinction, while often useful in determining what is exempt under Exemption 5, should not serve as a talismanic incantation in every case. *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 800 n. 17, 104 S.Ct. 1488, 1493, 79 L.Ed.2d 814 (1984); *Wolfe v. Department of Health and Human Services*, 839 F.2d 768 (D.C.Cir.1988) (en banc). *See also Parke, Davis & Co.*, 623 F.2d at 6 ("Nor is it possible to hold that all factual material is subject to disclosure while all advisory material, containing opinions and recommendations, is covered by Exemption 5."). "In some circumstanc-

es, ... the disclosure of even purely factual material may so expose the deliberative process within an agency that it must be deemed exempted by [Exemption 5]." *Mead Data Central, Inc. v. United States Department of Air Force*, 566 F.2d 242, 256 (D.C.Cir.1977) (citations omitted). Conversely, documents considered advisory may reveal very little about the deliberative process, and their disclosure would not cause agency personnel to temper their views. *Id.* at 256 n. 40 (citing *Vaughn v. Rosen*, 523 F.2d 1136, 1145 (D.C.Cir.1975)).

Because Exemption 5 is concerned with protecting the deliberative process itself, courts now focus less on the material sought and more on the effect of the material's release:

> the key question in Exemption 5 cases [is] whether disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage discussion within the agency and thereby undermine the agency's ability to perform its functions.

*Dudman Communications Corp. v. Department of Air Force*, 815 F.2d 1565, 1568 (D.C.Cir.1987).

**B**

We believe the ALJ memorandum is protected by the deliberative process privilege and, therefore, need not be disclosed under this exemption.[5] The situation here is exactly that for which Exemption 5 was designed. As part of a generic process initiated by the agency, the Schell group made suggestions for changes in the operation of the agency. The ALJs here opposed those suggestions, and made recommendations of their own. They sent this advice to their superiors at several levels in the organization.

The memorandum is the kind of candid document expressing personal views which,

---

5. We note that the FOIA affidavit submitted to the district court was too conclusory for a well-informed assessment of the applicability of Exemption 5. "We require specificity and detail in support of an Exemption 5 claim." *Parke, Davis & Co.*, 623 F.2d at 6. It is only because we have exercised our discretion to review *in camera* the

document that we are prepared to address this exemption. We caution that such review is rare, and should not be a substitute for a specific and detailed affidavit setting forth the reasons supporting nondisclosure. *See Mead Data Central*, 566 F.2d at 260–61.

if disclosed, would likely "stifle honest and frank communication within the agency." *Coastal States Gas Corp.*, 617 F.2d at 866. *See Sears, Roebuck & Co.*, 421 U.S. at 150, 95 S.Ct. at 1516 (deliberative process privilege protects "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."). "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *United States v. Nixon*, 418 U.S. 683, 705, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974). We have little doubt that the ALJs' advice would not have been so forthcoming had they known the memorandum would have reached public attention.

Schell argues that the document in question was not predecisional because it did not antedate the adoption of an agency policy. According to the FOIA officer, "no action has been taken by OHA management in response to the subject memorandum."

There have been cases in some circuits which hold that a document is predecisional only if a specific decision to which it relates can be identified. *See, e.g., Senate of the Commonwealth of Puerto Rico v. United States Department of Justice*, 823 F.2d 574, 585 (D.C.Cir.1987) (quoting *Paisley v. CIA*, 712 F.2d 686, 698 (D.C.Cir.1983), *vacated in part on other grounds*, 724 F.2d 201 (D.C.Cir.1984)) ("Accordingly, to approve exemption of a document as predecisional, a court must be able 'to pinpoint an agency decision or policy to which the document contributed.' ").

We believe this is an unduly restrictive interpretation of the exemption. When specific advice is provided, including opposition to the suggestions of others, it is no less predecisional because it is accepted or rejected in silence, or perhaps simply incorporated into the thinking of superiors for future use. Whether or not any action is taken in response to a subordinate's proposal, the effect of disclosing material that truly reflects the deliberative process will be the same: to stifle open and frank communication between subordinates and superiors. A subordinate who wishes to provide information candidly should not fear that the public will be privy to his views merely because his superiors have not yet acted on his recommendations, or they have rejected them without comment. Concomitantly, a superior should be able to receive candid suggestions privately, even if he does not stamp them "accepted" or "rejected."

In the instant case, the ALJs' recommendations have not yet been implemented, though neither have those of the PEP group. Indeed, both may languish within the bureaucracy, though there may never be a specific directive clearly labelling them "rejected." But that fact should not be dispositive if disclosure would erode the confidence that subordinates feel to communicate their ideas without threat of public exposure. We would think it anomalous that the status of the ALJ memorandum should depend on whether a superior had specifically acted upon the document after reading it. In a similar vein, it would be equally anomalous for a memorandum from a cabinet officer to the President suggesting a particular policy position to be protected if the President replied "yes," "no," "not yet," or "next year," but to be unprotected if the document had not yet been considered, or had been seriously considered but no explicit decision rendered.

In *NLRB v. Sears, Roebuck & Co.*, the Supreme Court admonished:

Our emphasis on the need to protect *predecisional* documents does not mean that the existence of the privilege turns on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared. Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations

which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process. (emphasis in original)

*Sears, Roebuck & Co.*, 421 U.S. at 151 n. 18, 95 S.Ct. at 1517 n. 18. *See* H.R.Rep. 1497, 89th Cong., 2d Sess. 10, *reprinted in* 1966 U.S.Code Cong. & Admin.News 2418, 2427 ("a Government agency cannot always operate effectively if it is required to disclose documents or information which it has received or generated before it completes the process of awarding a contract or issuing an order, decision or regulation.").

We do not mean to suggest that the existence of a decision to which a requested document contributed is wholly irrelevant. On the contrary, this will be one factor, among several, to which courts should look to determine if a document is predecisional. We do not find it dispositive, however.

■ In determining whether a document is predecisional, courts should also look to the identities of the parties to the memorandum: "a document from a subordinate to a superior official is more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made." *Coastal States Gas Corp.*, 617 F.2d at 868. Equally informative is whether the document is recommendatory in nature, perhaps containing evaluations or opinions. *Id.* at 866.

The ALJ memorandum has many of the attributes of a predecisional document. As

noted, the document contains nothing but candid advice and recommendations from subordinates to superiors on what agency policy should be. Such matters are at the heart of Exemption 5, and sanctioning release of such material would almost certainly have a chilling effect on candid expression of views by subordinates.[6]

We also reject Schell's contention that the memorandum is not "deliberative." Simply put, the document "reflects the give-and-take of the consultative process" by weighing the suggestions of the PEP group and making responsive recommendations in an effort to change procedures in the Lansing office. "Discussions among agency personnel about the relative merits of various positions which might be adopted ... are as much a part of the deliberative process as the actual recommendations and advice which are agreed upon." *Mead Data Central*, 566 F.2d at 257. *Cf. Central States Gas Corp.*, 617 F.2d at 869 ("The documents do not ... discuss the wisdom or merits of a particular agency policy, or recommend new agency policy, raising the possibility that their disclosure would mislead the public.").[7]

It is the free flow of advice, rather than the value of any particular piece of information, that Exemption 5 seeks to protect. "Congress enacted Exemption 5 to protect the executive's deliberative processes—not to protect specific materials." *Dudman Communications Corp.*, 815 F.2d at 1568. This rationale fully supports withholding in this case, even if the particular advice cannot be shown to have any great social or decisional value. Accordingly, we AF-

---

**6.** This does not mean that otherwise disclosable material is necessarily protected because it is included in a memorandum to a superior. An agency cannot withhold an entire document merely by showing that it contains some exempt material. *Mead Data Central*, 566 F.2d at 260. Indeed, the Act states rather clearly that "[a]ny reasonable segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt...." 5 U.S.C. § 552(b) (1982).

In the context of Exemption 5, "the agency will usually be able to excise the [exempt] material from the ... document and disguise the

material's source, and thus the agency will usually be able to release the material without disclosing any deliberative process. When the agency can take such steps, it may not withhold the information under Exemption 5." *Dudman Communications Corp.*, 815 F.2d at 1569. *See also Mead Data Central*, 566 F.2d at 260. In this case, however, there is nothing that can be divorced from the memorandum and disclosed, inasmuch as the document contains only advice, opinion and argumentation.

**7.** We do not find it relevant that the ALJ memorandum was "completely unsolicited."

FIRM the judgment of the district court.[8]

8. Since Schell's claim under the Privacy Act, 5 U.S.C. § 552a (1982), was not raised below, we will not consider it.