**COMMONWEALTH OF MASSACHU-SETTS, by its DEPARTMENT OF PUBLIC WELFARE, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.**

Civ. A. No. 88–0949–Y.

United States District Court, D. Massachusetts.

Dec. 11, 1989.

Leah W. Sprague, Eugene B. Benson, Boston, Mass., for plaintiff.

Leila Kern, Asst. U.S. Atty., for defendant.

MEMORANDUM AND ORDER

YOUNG, District Judge.

This action is brought by the Commonwealth of Massachusetts Department of Public Welfare ("the State Agency") under the Freedom of Information Act ("the

Act"), 5 U.S.C. sec. 552 (1966), seeking release of five documents in the custody of the United States Department of Health and Human Services ("the Federal Agency"). The facts are not in dispute. The parties' cross-motions for summary judgment are presently before the Court.

By letter dated September 10, 1987, Kristen Bauer, the Assistant General Counsel of the State Agency, requested the release, pursuant to the Act, of various documents regarding the implementation of 45 CFR sec. 205.42(g). This federal agency regulation sets out general guidelines for reducing federal financial participation in the cooperatively funded Aid to Families with Dependent Children program ("AFDC") as well as the provisions under which such reductions might be waived by the Federal Agency's Family Support Administration.[1] Ms. Bauer specifically requested all documents "relating to"[2] the evaluation of states' so-called "good faith waiver" requests. Russell M. Roberts, Director of the Freedom of Information/Privacy Act Division of the Federal Agency's Office of Public Affairs, withheld certain of these documents, citing 5 U.S.C. sec. 552(b). This provision makes the Act's mandatory disclosure requirements inapplicable to certain "types of information that the Executive Branch must have the option to keep confidential, if it so chooses." *Environmental Protection Agency v. Mink*, 410 U.S. 73, 80, 93 S.Ct. 827, 832, 35 L.Ed.2d 119 (1973). Acting on Ms. Bauer's appeal, the Family Support Administration withheld five documents pursuant to section 552(b)(2) ("Exemption 2") and section 552(b)(5) ("Exemption 5"). When it became clear that the final decision of the Secretary of Health and Human Services was to withhold these five documents from disclosure, the Commonwealth of Massachusetts brought this action under the Act to compel disclosure.

The Federal Agency has submitted a *Vaughn* affidavit outlining the contents of the five documents in question, *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir.1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), and has also submitted, for *in camera* inspection, the documents themselves. The Federal Agency argues that some of the material sought here comes within the parameters of Exemption 2, 5 U.S.C. sec. 552(b)(2), and that the other material is exempt from mandatory disclosure under Exemption 5, 5 U.S.C. sec. 552(b)(5).

### A. Exemption 2: "Internal Personnel Rules and Practices"

The factual, indeed the legal, parameters of Exemption 2 are not yet clear in this Circuit. Exemption 2 of the Act permits an agency in receipt of a disclosure request to refuse to disclose documents that are "re-

---

1. The AFDC program is a welfare program jointly administered and funded by the federal government and the states. State administrators determine who is eligible for AFDC payments and make payments to those families. The federal government participates in the program by "matching" the funds expended by the states in AFDC payments so that each sovereign shares the welfare burden equally. The United States Office of Family Assistance, Family Support Administration, however, monitors states' payments for error and will reduce or increase the amount of federal financial participation depending on the percentage of AFDC payments erroneously made by a State. 45 CFR sec. 205.-42–43. The purpose behind this scheme is to create the incentive for states to reduce the amount of payments made in error to those not eligible for AFDC benefits. If a State does not meet the national standard for error, or the target error rate established for the individual State, its federal matching funds will be partial-

ly disallowed unless the State shows that it made a good faith effort to meet the target rate. 45 CFR sec. 205.42(f). The applicable federal regulations indicate that a finding that a State did not meet the target error rate despite a good faith effort may be made only in "extraordinary circumstances." *See* 45 CFR sec. 205.42(g).

2. A request for all documents "relating to" a subject is usually subject to criticism as overbroad since life, like law, is "a seamless web," and all documents "relate" to all others in some remote fashion. Such a request thus unfairly places the onus of non-production on the recipient of the request and not where it belongs—upon the person who drafted such a sloppy request. Just as such requests are objectionable under Fed.R.Civ.P. 26(b)(1), so ought they be objectionable under the Act. In this case, of course, the point is of no moment since the federal agency responded without objecting to the overbreadth of the request.

lated solely to the internal personnel rules and practices of an agency." 5 U.S.C. sec. 552(b)(2). The language of this exemption presents a variety of interpretive problems. It is at once both too broad and too narrow. Apart from syntactic ambiguities,[3] there is the question of how much stress to lay on the word "solely." Even material that is designed exclusively to deal with internal personnel issues, such as the criteria for evaluating agency employees for promotion, does, in fact, also "relate" to a variety of more general policy issues—such as, for example, the general public interest in ensuring that federal agency employees are the best qualified to shoulder the kind of public responsibilities with which the nation entrusts them. *See Kaganove v. Environmental Protection Agency*, 856 F.2d 884, 887–88 (7th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 798, 102 L.Ed.2d 789 (1989) (calling such a question a "close issue"). If one were to endorse an expansive reading of the exemption, the conceivable scope of what may "relate" to the "practices of an agency" is limited only by the imagination. Alternatively, as is well-recognized, a reading of Exemption 2 that focuses narrowly on the word "solely" would be unworkable in particular cases, since every action of our federal government has in some way "some effect on the public-at-large ... [for] 'there are few events in our society today that occur without so much as a tiny ripple effect outside their area of prime impact.'" *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1073 (D.C.Cir.1981) (*en banc*) (quoting *Vaughn v. Rosen*, 523 F.2d 1136, 1150 [D.C.Cir.1975] [Leventhal, J., concurring]); *see also National Treasury Employees Union v. U.S. Customs Service*, 802 F.2d 525, 528 (D.C.Cir.1986). Both an overly expansive and an unduly cramped reading render the exemption practically meaningless. Still, Congress plainly intended to permit an agency, in some circumstances, to refuse to comply with a request under the Act pursuant to Exemption 2.

The Supreme Court in *Department of the Air Force v. Rose*, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), identified the government interests in nondisclosure under Exemption 2 as interests (1) in avoiding disclosure where it "may risk circumvention of agency regulation" and (2) in being relieved "of the burden of assembling and maintaining for public inspection matter in which the public cannot reasonably be expected to have an interest." *Id.* at 369–70, 96 S.Ct. at 1603. The Supreme Court ruled in *Rose* simply that summaries of Air Force Honor Board hearings were not within the scope of Exemption 2 and must be disclosed, but buttressed its reasoning by pointing out that "the situation is *not* one where disclosure may risk circumvention of agency regulation." *Id.* at 369, 96 S.Ct. at 1603. (emphasis added). The comment being merely *dicta, Rose* does not affirmatively require any showing of either significant risk to the circumvention of agency regulation or the public's legitimate interest in the disclosure of the material in question. The *Rose* court thus left open whether Exemption 2 might be available to block disclosure in cases where the literal language of the exemption, fairly read, does not cover the material, but release of the information sought might nonetheless lead to a circumvention of agency statutes or regulations. *Id.* at 364–65, 96 S.Ct. at 1600–01.

---

**3.** As to the syntactic difficulties, the position of the District of Columbia Circuit Court of Appeals has long been that Exemption 2 may apply not only to internal personnel rules of an agency but also to the internal practices of an agency. *Ginsburg, Feldman & Bress v. Federal Energy Administration*, 591 F.2d 717, 723 (D.C.Cir. 1978), *aff'd en banc and per curiam by an equally divided court*, 591 F.2d 752 (D.C.Cir.1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979). Thus materials that are not solely related to personnel rules could still fall within Exemption 2 "to the extent that they could be classified as 'practices of an agency' as referred to in the House Report." *Id.* at 725. *See also* H.R.Rep. No. 1497, 89th Cong., 2d Sess. 10, 15 (1966). The *Ginsburg* court concluded that the House Report evidenced a legislative intention that "operating rules [referring to the functioning of the agency in its public duties], guidelines and manuals of procedure for government investigators or examiners" are to be exempt under Exemption 2. *Ginsburg*, 591 F.2d at 724 (quoting H.R.Rep. No. 1497, 89th Cong., 2d Sess. 15 [1966]).

**38**

■ The First Circuit has not formulated a test for use in evaluating the applicability of Exemption 2 to material such as is presented in this case.[4] The Court of Appeals for the District of Columbia Circuit, however, has recognized, in a well-considered *en banc* decision, both the linguistic problems inherent in the statute and the practical necessity that a workable approach be developed so that the will of Congress be done. *See Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051 (D.C.Cir.1981) (*en banc*). That Court of Appeals has set out a two-part test for Exemption 2 analysis. *Id.* at 1074. This test requires not only a showing that the material is "predominantly" for internal use, but it also requires some showing that disclosure will prejudice the enforcement of agency regulations or statutes. Under *Crooker*, disclosure is not mandated by the Act "if a document for which disclosure is sought meets the test of 'predominant internality,' and if disclosure significantly risks circumvention of agency regulations or statutes." *Id.* *See also Founding Church of Scientology of Washington, D.C., Inc. v. Smith*, 721 F.2d 828, 830 n. 4 (D.C.Cir.1983) (material related only to "trivial administrative matters of no genuine public interest" need not be disclosed under Exemption 2). In the absence of more explicit guidance from the First Circuit, this Court follows *Crooker* and adopts its reasoning in this case.

As indicated, the first prong of the *Crooker* test recognizes that the "critical considerations ... [focus on whether the material] is used for predominantly internal purposes...." 670 F.2d at 1073. This approach has much to recommend it since it is both practical and implements the Congressional intent. It is apparent that Congress intended that the Exemption 2 line be drawn "between minor or trivial matters and those more substantial matters which might be the subject of legitimate public interest," *Rose*, 425 U.S. at 365, 96 S.Ct. at 1601. (quoting *Vaughn*, 523 F.2d at 1142), except where there is the threat that disclosure would lead to the circumvention of agency regulation, *Rose*, 425 U.S. at 366–67, 96 S.Ct. at 1601–02. The question under the first prong of the *Crooker* test, then, is whether the material sought relates to predominantly internal agency workings or whether it is instead material in which there is a legitimate public interest in disclosure, although it still might be exempt if disclosure risks the circumvention of law.[5]

The second prong of the *Crooker* test—whether disclosure in fact "significantly

---

4. The First Circuit has upheld the non-disclosure of a Bureau of Alcohol, Tobacco and Firearms ("Bureau") investigatory report "compiled for law enforcement purposes." *Wightman v. Bureau of Alcohol, Tobacco & Firearms*, 755 F.2d 979, 981 (1st Cir.1985). *Wightman* does not help this Court in its consideration of the present case, however. Its application here is problematic. The *Wightman* court upheld the exempt status of the material in question there under both Exemption 2 and Exemption 7. Exemption 7 applies generally to "investigatory records compiled for law enforcement purposes." 5 U.S.C. sec. 552(b)(7). The material sought in *Wightman* included, however, "material relating solely to the internal practices of the [Bureau] (e.g., computer codes)." 755 F.2d at 982. This suggests that the *Wightman* court grounded its decision on the fact that the material at issue was in part exempt under Exemption 7 and in part exempt under Exemption 2. Unfortunately, this decision does not help resolve the issue of how broadly Exemption 2 should be interpreted, nor does it adopt or reject the approach of the D.C. Circuit as expressed below in *Crooker*.

5. The Court is mindful that in our structure of government it is ordinarily under a duty to eschew policy determinations concerning what is or is not of "legitimate public interest" as such determinations implicate core values under the First Amendment. Absent constitutional considerations, of course, its duty is to interpret the law Congress passed. The Court finds itself on the twin horns of a dilemma implicitly created by *Crooker*. On the one hand it is clear that in passing the Act "Congress has made the determination that except for certain specified materials, all government documents are of legitimate public interest." *Crooker*, 670 F.2d at 1066. On the other hand, *Rose*, which provided the foundation for the *Crooker* test, suggests that Congress intended courts to interpret Exemption 2 conscious that "the line sought to be drawn is between minor and trivial matters and those more substantial matters which might be the subject of legitimate public interest." 425 U.S. at 365, 96 S.Ct. at 1601. Obviously, this approach leaves it up to the individual judge to determine on what side of the legitimacy line a particular request for information falls.

risks circumvention of agency regulations or statutes," 670 F.2d at 1074—also functions to implement discernible Congressional intent. As the *Crooker* court discussed, the House and Senate reports varied in their respective treatment of the scope of the Exemption 2 privilege against disclosure where the materials sought might aid in the circumvention of the law. 670 F.2d at 1065. The House report indicates the judgment of the House of Representatives that investigatory techniques used by law enforcement agencies, for instance, were not "the subject of legitimate public interest" because disclosure would undermine the effectiveness of federal law enforcement. *See id.* at 1059–61. Although the Senate report [6] is silent concerning this judgment, such silence is no indication of a contradictory intent. *See Crooker*, 670 F.2d at 1065.

In light of the *Rose* dicta noted above and in the absence of legislative history clearly to the contrary, pre*Crooker* courts of appeals generally engrafted a "circumvention" element into their readings of Exemption 2 when dealing with material published for the benefit of federal law enforcement officers, the release of which might hinder effective law enforcement. *See, e.g., Caplan v. Bureau of Alcohol, Tobacco & Firearms*, 587 F.2d 544 (2nd Cir.1978) (Bureau's "Raids & Searches" manual for Bureau officers, dealing with enforcement methods, within Exemption 2). Similarly, manuals and guidelines published solely to help administrators supervise entities subject to agency supervision have been exempted for this reason where the guidelines serve an auditing function. *See, e.g., Ginsburg, Feldman & Bress v. Federal Energy Administration*, 591 F.2d 717, 718–21 (agency's guidelines intended "to assure that the costs oil refiners use in computing their prices are correct and that the reports they make to the FEA are accurate" within Exemption 2). *See also Jordan v. United States Department of Justice*, 591 F.2d 753, 783 (D.C.Cir.1978) (*en banc*) ("Exemption 2 is applicable where the document consists of internal instructions to such government officials as investigators and bank examiners. In such a case disclosure would permit circumvention of the law, and there is no substantial, valid external interest of the community at large in revelation.") This mode of analysis has obtained, post-*Crooker*, in other Circuits. *See, e.g., Dirksen v. United States Department of Health and Human Services*, 803 F.2d 1456, 1458–59 (9th Cir.1986) ("Medicare Policy Guidelines" that specify, *inter alia*, what kinds of claims were to be "automatically granted" held exempt on the district court's finding that some health care providers "would try to fit their claims into the 'automatically granted' category").

It is indisputable that "disclosure, not secrecy, is the dominant objective" of the Act. *Rose*, 425 U.S. at 361, 96 S.Ct. at 1599. Congress intended Exemption 2 to be read narrowly. *New England Apple Council v. Donovan*, 725 F.2d 139, 141 (1st Cir.1984). Therefore, any extension or "clarification" of the problematic language of Exemption 2 to countenance nondisclosure should only apply in those circumstances in which "knowledge of administrative procedures might help outsiders to circumvent regulations or standards." *Rose*, 425 U.S. at 364, 96 S.Ct. at 1601.

Accordingly, this Court rules that the second prong of the *Crooker* test—affirmatively requiring a showing of significant risk of circumvention of agency regulation or other law by the disclosure of material that relates predominantly to internal agen-

---

**6.** Ventures into labyrinth of legislative history can be confusing. Peculiar hazards lurk with respect to the Freedom of Information Act. As the First Circuit has put it, discussing the scope of 5 U.S.C. sec. 552(b)(4) (Exemption 4):

The attempt to analyse the [Act's] legislative history is complicated further by the fact that the 1966 House Report has been discredited as an aid to interpreting the Act because it was submitted after the Senate had made its

report and passed the bill. The House then passed the bill without amendment, thereby depriving the Senate of the opportunity to object or concur in the interpretation of the Act written into the House Report.

*9 to 5 Organization for Women Office Workers v. Board of Governors of the Federal Reserve System*, 721 F.2d 1, 7 (1st Cir.1983) (citations omitted).

cy workings—represents a sound approach to applying the intent of Congress in this regard and adopts *Crooker* as the controlling standard of law in this case.[7] *Cf. National Treasury Employees Union v. U.S. Customs Service,* 802 F.2d 525, 531 (D.C.Cir.1986) (no need to address second prong of *Crooker* where the materials sought—materials used internally by personnel officers solely to evaluate candidates for job promotion—"fall squarely within the statutory language").

■ In this case, two of the five contested documents are being withheld pursuant to Exemption 2. The first document is a 53–page guide, in the form of a workbook, for the Family Support Administration's 1982 Waiver Review Process ("Document 1" or "the 1982 Guide"). The 1982 Guide is intended for use by administrators reviewing a State's request for waiver of the federal financial participation reduction (triggered by a State's failure to meet target error standards) by reason of that State's timely development and implementation of corrective action reasonably designed to meet the target error rate. *See* 45 CFR sec. 205.42(g)(2)(v). Subsection

(g)(2)(v) of the pertinent agency regulation promulgates the four factors the Family Support Administration will evaluate in determining whether a State has indeed made a good faith effort in these circumstances.[8] The 1982 Guide supplements the standards as set out in the published regulation, but is not intended for public dissemination. It contains further criteria to be applied in evaluating whether a given factor under consideration weighs in favor of granting waiver or does not and, if it does, what weight that factor should be given overall. The published regulation merely indicates that "we will consider" the four listed factors. *See* 45 CFR sec. 205.42(g)(2)(v). The 1982 Guide thus provides a framework for an administrator to "score" a State's performance with respect to each of the four factors and assigns percentages of relative weight to accord the scores achieved by the State under each factor.

The second document for which exemption is claimed under Exemption 2 is the Family Support Administration's 1981 Waiver Review Guide ("Document 5" or the "1981 Guide"), a fourteen page type-

---

7. In the wake of *Crooker,* one panel of judges from the District of Columbia Circuit, in a *per curiam* opinion, expressed the view that "[i]t is conceivable that this [second prong requirement] may be overbroad in light of Supreme Court precedent and the legislative history." *Founding Church of Scientology of Washington, D.C., Inc.,* 721 F.2d 828, 830 (D.C.Cir.1983). That court did not address the issue further. This Court notes a more recent decision from the Seventh Circuit, discussing the applicability of Exemption 2 to the Environmental Protection Agency's employee promotion rating plan, *Kaganove v. Environmental Protection Agency,* 856 F.2d 884 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 798, 102 L.Ed.2d 789 (1989). In *Kaganove,* the court points out that subsequent legislative history reinforces the view that *Crooker* represents a correct interpretation of Congressional intent:

> The Freedom of Information Reform Act of 1986 evidences that *Crooker* was correctly decided. The Reform Act codified *Crooker,* as it applies to law enforcement agencies, into Exemption 7 of the FOIA. Pursuant to section 1802 of the Reform Act, Exemption 7 now provides, in pertinent part, that "guidelines for law enforcement investigations or prosecutions [need not be disclosed] if such disclosure could reasonably be expected to *risk circumvention of the law*...." (emphasis sup-

plied). The legislative history of the Reform Act expressly states that this amendment was modeled after "the 'circumvention of the law' standard that the D.C. Circuit established in its en banc decision in *Crooker v. BATF,* 670 F.2d 1051 (D.C.Cir.1981) (en banc) (interpreting Exemption 2)." Because Congress saw fit to codify the very language of *Crooker,* and because nothing in the legislative history suggests the slightest disagreement with that case's holding, we believe that *Crooker* accurately expresses congressional intentions.

*Kaganove,* 856 F.2d at 888–89 (citations omitted).

8. These are:

> (A) Demonstrated commitment by top management to the error reduction program . . .
>
> (B) Sufficiency and quality of systems designed to reduce errors that are operational in the State
>
> .     .     .     .     .
>
> (C) Use of effective system and procedures for the statistical and program analysis of [the quality control system that provides data on incorrect payments and nonpayments] . . .
>
> (D) Effective management and execution of the correction action process . . .

45 CFR sec. 205.42(g)(2)(v)(A–D).

written document which also contains instructions and worksheets for evaluating states' good faith waiver claims. The 1981 Guide is functionally similar to the 1982 Guide but far less detailed.

Normally, administrative staff manuals, like these, and instructions to staff that affect a member of the public must be revealed. 5 U.S.C. sec. 552(a)(2)(C). The question before the Court is whether Exemption 2 will except the material from disclosure. This material is not "solely" related either to internal personnel rules or to the internal practices of an agency, as it also "relates" to the financing of the jointly funded AFDC program, a matter of significant public interest. The material thus is not exempt from disclosure by the express language of the exemption. Clearly, though, the two documents are predominantly for internal use: to instruct agency operatives in determining whether a state meets the Family Support Administration's qualifications for a waiver of a reduction in federal financial participation. Therefore, under *Crooker*, the material will be exempt under Exemption 2 only if disclosure of these documents risks circumvention of the law.

The cases in which courts have found a significant risk that dissemination of such internal documents might result in a circumvention of agency regulations or other law are strikingly different, factually, from the instant case. In *Ginsburg, Feldman & Bress*, for instance, the Court of Appeals for the District of Columbia Circuit affirmed a ruling that the Federal Energy Administration's guidelines and instructions to employees who audit the petroleum industry's compliance with various federal laws and regulations should be exempt from disclosure under Exemption 2. 591 F.2d 717. The district judge there had examined these guidelines *in camera* and concluded that they "laid out the 'enforcement game plan' which because 'FEA auditors cannot possibly check each entry and computation necessary to determine whether refiners have complied with the regulations in full ... must rely on spot checks, random sampling, and analysis of selected key figures.' " *Id.* at 728 n. 21. Thus, the requested guidelines worked to " 'outline the FEA's audit strategy.' " *Id.* The *Ginsburg* court considered most important the distinction between administrative staff manuals, normally not exempt from disclosure, *see* 5 U.S.C. sec. 552(a)(2)(C), and law enforcement manuals for use by government personnel, expressly protected under Exemption 7, 5 U.S.C. sec. 552(b)(7). As the internal guidelines in *Ginsburg* were more analogous to law enforcement manuals, the "disclosure [of which] *would* significantly impede the enforcement process," 591 F.2d at 731 n. 24 (emphasis original), they were properly within the scope of Exemption 2. Other circuits considering requests for disclosure of administrative manuals have focused on the distinction between law enforcement material dealing with enforcement techniques or methods and administrative material which helps staff determine when laws have been violated or regulatory standards not met. *Caplan v. Bureau of Alcohol, Tobacco and Firearms*, 587 F.2d 544 (2d Cir.1978) (disclosure of Bureau "Raid and Searches" manual would hinder investigations and enable violators to escape detection); *Dirksen v. United States Department of Health and Human Services*, 803 F.2d 1456 (9th Cir.1986) (disclosure of internal guidelines for Blue Shield personnel to determine whether claims for billed services should automatically be paid without review not required on district court's finding that health care providers in possession of material would try to fit their claims into the "automatically" granted category). *See also Wilder v. Commissioner of Internal Revenue Service*, 607 F.Supp. 1013 (D.C. Ala.1985) (disclosure of IRS guidelines that specify when returns would not be reviewed significantly risks circumvention of law).

What makes this case strikingly different from those just cited is the fact that here it is the Commonwealth of Massachusetts—one of the sovereign states within the federal union—that desires production. This Court is aware of no reported case in which a sovereign state has requested disclosure of federal administrative manuals

only to find disclosure contested pursuant to Exemption 2. The reason is not difficult to discern. In effect, the federal agency is contending here that, if disclosure is made, the Commonwealth of Massachusetts will tailor its compliance to address only those criteria it learns are the subject of intensive review, ignoring the remaining criteria and thus circumventing and frustrating the federal law. Such a contention is unworthy of the Federal Agency and the attorneys who advance it. To countenance it is to ignore the essence of federal-state comity that has allowed our republic to flourish for more than two hundred years. Lest there be any doubt, the parties are reminded that, subject to the powers constitutionally delegated to the federal government, U.S. Const. amend. X, and the supremacy clause that is necessary for their proper implementation, U.S. Const. art. VI, the states of this union are themselves sovereign. The Act simply cannot be interpreted in such a way as to presumptively brand a sovereign state as likely to circumvent federal law. The second prong of Exemption 2 does not apply when it is Massachusetts itself that seeks the information.

Falling back, the Federal Agency contends that, even if the motives of Massachusetts itself cannot be impugned, Exemption 2 may be invoked to bar access to its officials who could well be motivated to bend the regulations to maximize the federal revenues sought by the Commonwealth. This contention is likewise inapposite in the circumstances presented here.[9] State officials are entitled to a presumption of regularity in discharging their duties. *See Fryer v. Department of Public Utilities*, 374 Mass. 685, 690 n. 2, 373 N.E.2d 977 (1978). Upon this record, where there is not a scintilla of evidence that Massachusetts officials have circumvented or are planning any circumvention of the law, that unrebutted presumption, *see* Fed.R.Evid.

301, is sufficient to overcome the hypothetical potential for abuse.

Accordingly, the documents withheld on the ground of Exemption 2 must be disclosed.

**B.** *Exemption 5: The "Deliberative Process" Privilege*

■ The federal agency also seeks protection from disclosure under Exemption 5, 5 U.S.C. sec. 552(b)(5), which covers "interagency or intra-agency memorandums [sic] or letters which would not be available by law to a party other than an agency in litigation with the agency." The parameters of Exemption 5 are clearer than those of Exemption 2: it "simply incorporates civil discovery privileges." *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799, 104 S.Ct. 1488, 1492, 79 L.Ed.2d 814 (1984). *See also Renegotiation Board v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 184, 95 S.Ct. 1491, 1500, 44 L.Ed.2d 57 (1975) (accord). As the Supreme Court has put it, "[t]he test under Exemption 5 is whether the documents would be 'routinely' or 'normally' disclosed upon a showing of relevance." *Weber Aircraft*, 465 U.S. at 799, 104 S.Ct. at 1492 (quoting *Federal Trade Commission v. Grolier Inc.*, 462 U.S. 19, 26, 103 S.Ct. 2209, 2213, 76 L.Ed.2d 387 [1983]). The Supreme Court has also indicated that although "it is not clear that Exemption 5 was intended to incorporate every privilege known to civil discovery," *Federal Open Market Committee v. Merrill*, 443 U.S. 340, 354, 99 S.Ct. 2800, 2809, 61 L.Ed.2d 587 (1979), Exemption 5 functions by rough analogy "to exempt those documents, and only those documents, normally privileged in the civil discovery context." *National Labor Relations Board v. Sears, Roebuck & Co.*, 421 U.S. 132, 149, 95 S.Ct. 1504, 1515, 44 L.Ed.2d 29 (1975). *See Environmental Protection Agency v. Mink*, 410 U.S. 73, 86, 93 S.Ct. 827, 835, 35 L.Ed.2d 119 (1973) (Exemption 5 "clearly

**9.** The limiting phrase is unfortunately necessary since situations can be imagined where state officials may actively seek to compromise or obstruct national domestic, foreign or defense policies. *See, e.g., Dukakis v. United States Department of Defense*, 686 F.Supp. 30 (D.Mass.

1988), *aff'd* 859 F.2d 1066 (1st Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 1743, 104 L.Ed.2d 181 (1989). Against such a backdrop, Exemption 2 might yet play some limited role in evaluating the information request of a state official.

contemplates that the public is entitled to all such memoranda or letters that a private party could discover in litigation with the agency"). *See also United States Dept. of Justice v. Julian*, 486 U.S. 1, 108 S.Ct. 1606, 100 L.Ed.2d 1 (1988). This rule is consonant with the policy of construing the Act's exemptions narrowly. *New England Apple Council v. Donovan*, 725 F.2d 139, 141 (1st Cir.1984).

The Supreme Court has expressly recognized that Congress intended Exemption 5 to encompass an "executive privilege" sufficiently broad to include confidential advisory opinions the disclosure of which would be injurious to the consultative functions of government, so as to protect the government's deliberative and decision-making processes. *Sears*, 421 U.S. at 149–50, 95 S.Ct. at 1515–16. The Act, then, is inapplicable to material that would be protected by an executive privilege from discovery in civil litigation.[10]

To come within Exemption 5, the material in question cannot represent effective agency policy.[11] Also, although it protects advisory materials which truly reflect the deliberative or policymaking processes of an executive agency, Exemption 5 does not protect "purely factual, investigative matters." *Environmental Protection Agency v. Mink*, 410 U.S. at 89, 93 S.Ct. at 837.

Not surprisingly, it has become nearly axiomatic in jurisprudence under the Act that to assert an executive privilege so as to come under the aegis of the Exemption 5 "deliberative process" exemption, government must show that the material sought to be withheld is both "predecisional" and "deliberative." *Wolfe v. Department of Health and Human Services*, 839 F.2d 768, 774 (D.C.Cir.1988) (*en banc*) (citing *Mink*, 410 U.S. 73, 93 S.Ct. at 827). There is little ambiguity about the accepted meaning of these words. For instance, "[a] document is 'predecisional' when it is 'received by the decisionmaker on the subject of the decision prior to the time the decision is made'." *Schell v. United States Department of Health and Human Services*, 843 F.2d 933, 940 (6th Cir.1988) (quoting *Sears*, 421 U.S. at 151, 95 S.Ct. at 1516). A document is deliberative when it "reflects the give-and-take of the consultative process." *Coastal States Gas Corp.*, 617 F.2d at 866; *Wolfe*, 839 F.2d at 774; *Schell*, 843 F.2d at 940.

Three documents, and parts of a fourth, are in question here. "Document 2" consists of one hundred fifty five pages of analysis, treating the nature of the supporting information filed in nineteen states' 1981 petitions for waiver of the reduction in federal financial participation in AFDC programs, petitions which were grounded in the argument that waiver is appropriate in view of the existence of extraordinary circumstances that made it impossible to meet targeted error rates. "Document 3" is a document of seven pages which sum-

---

10. The proper functioning and general purpose of executive privilege is well-settled. "Manifestly, the ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions. The quality of a particular agency decision will clearly be affected by the [inter-agency or intra-agency] communications received by the decisionmaker on the subject of the decision prior to the time the decision is made." *Sears*, 421 U.S. at 151, 95 S.Ct. at 1516. Exemption 5 is designed "to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which

were not in fact the ultimate reasons for the agency's action." *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C. Cir.1980).

11. To be legitimate, law must be promulgated. "Secret law" is neither legitimate nor covered by executive privilege. There is thus a difference between agency policies established and followed to implement an agency's statutory mandate, or what is effectively agency "law," and what executive privilege protects. The Supreme Court has expressed this distinction: "Exemption 5, properly construed, calls for disclosure of all opinions and interpretations which embody the agency's effective law and policy, and the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be." *Sears*, 421 U.S. at 153, 95 S.Ct. at 1517 (citations omitted).

marizes the nature of the supporting documentation submitted by all states seeking waivers for the fiscal year 1983. "Document 4" is an eighty page summary and comparative evaluation of the information provided by states in their requests for extraordinary-circumstances waivers for various years. The federal agency also claims that the deliberative process exemption should apply to portions of Document 5, the typewritten 1981 Guide, specifically to handwritten marginalia referring to the established instructions, which suggest different instructions that might be adopted.

■ The Court rules that disclosure of Documents 2, 3, and 4 will not reveal predicisional deliberative material. The documents are compilations of factual data which are not protected by Exemption 5. *See Environmental Protection Agency, v. Mink,* 410 U.S. at 89, 93 S.Ct. at 836. Although this Court does not use the distinction between fact and opinion as a talisman for application of Exemption 5, and recognizes that "[i]n some circumstance, even material that could be characterized as 'factual' would so expose the deliberative process that it must be covered by the privilege," *Wolfe,* 839 F.2d at 774, it is also mindful that "Exemption 5 disputes can often be resolved by the simple test that factual material must be disclosed but advice and recommendations may be withheld," *Id.* This is such a case. There is nothing "predecisional" about these materials. They relate to *past* decisions, being merely analyses of what data were submitted by states in *past* good faith waiver requests. The argument made by the federal agency—that knowledge of these analyses of past submissions "might tempt a state to communicate to a reviewer its idea of how the documents [previously submitted by other states] should have been interpreted, and how best to interpret the materials the state has most recently submitted"—is patently flawed. The agency analyses are not "predecisional" material about a pending matter. They are not transformed into a "predecisional" intra-agency communication by virtue of the fact that they may possibly be communicated to a reviewer considering pending requests.

Neither do these documents reflect "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated" within the meaning of the deliberative process privilege. *National Labor Relations Board v. Sears, Roebuck & Co.,* 421 U.S. 132, 150, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29 (1975) (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jera,* 40 F.R.D. 318, 324 (D.C.1966), *aff'd,* 384 F.2d 979 (1967)). It is apparent that none of the material is on the subject of a pending decision and it is hard to see how disclosure will inhibit the quality of agency decision-making. The government has not established its claim of privilege with respect to these documents.

That portion of Document 5, the 1981 Waiver Review Guide, which consists of marginal handwitten notations by an unknown hand, is also being withheld pursuant to Exemption 5. This Court rules that the government has not sustained its burden of proof to establish an executive privilege with respect to these notations. The federal agency argues that the notations suggest ways to improve the methods of analyzing waiver requests and therefore they amount to intra-agency "advisory opinions and recommendations." *See Meade Data Central, Inc. v. United States Department of the Air Force,* 566 F.2d 242, 256 (D.C.Cir.1977). Unfortunately, it does not appear on the record before the Court who wrote the notations and whether they are actually memoranda to anyone else. There is, therefore, no basis for the Court to conclude either that these notations in any way "reflect the agency's group thinking in the process of working out its policy and determining what its law shall be," *Sears,* 421 U.S. at 153, 95 S.Ct. at 1517, or that they are the comments, opinions or recommendations of a subordinate within an agency about existing or developing agency policy, *see Coastal States Gas Corp.,* 617 F.2d at 866. The privilege of nondisclosure not being established, this document must be revealed in its entirety.

C. *Conclusion*

Since the Federal Agency has failed, for the reasons limned above, to establish the

applicability of either Exemption 2 or Exemption 5 to the documents it has withheld, they are ordered disclosed to the State Agency forthwith.