**Louis A. MANNA, Pro Se, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, et al., Defendants.**

Civ. No. 92–1840.

United States District Court,
D. New Jersey.

March 4, 1993.

Louis A. Manna, pro se.

Michael Chertoff, U.S. Atty., Robert M. Hanna, Asst. U.S. Atty., U.S. Attorney's Office, Newark, NJ, for defendants.

OPINION

DEBEVOISE, District Judge.

Plaintiff, Louis A. Manna, presently incarcerated in the United States Penitentiary at Leavenworth, Kansas, instituted this action under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA") to obtain certain records in the possession of the United States Department of Justice (the "Justice Department"). The Justice Department and the United States Attorney for the District of New Jersey (collectively referred to as "defendants") move for summary judgment and plaintiff cross-moves for summary judgment and for an index of the withheld documents in accordance with *Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974) ("*Vaughn* index").[1]

The FOIA confers jurisdiction on this court pursuant to 5 U.S.C. § 552(a)(4)(B).

For the reasons provided below, defendants' motion for partial summary judgment is granted in its entirety except with respect to the information described in the Turner Declaration. Defendants may resubmit their application regarding this information as directed below in this opinion. Plaintiff's cross-motion for summary judgment is de-

1. "A *Vaughn Index* is a system of itemizing and indexing that correlates each of the government's justifications for its refusal to disclose the docu- ments with the actual portions of the documents at issue." *Lewis v. I.R.S.,* 823 F.2d 375, 377 n. 3 (9th Cir.1987).

nied and plaintiff's cross-motion for a *Vaughn* index is also denied.

## SUMMARY OF FACTS AND PROCEDURAL HISTORY

In order to fully appreciate defendants' reluctance to comply with plaintiff's document demand, a brief background of plaintiff's criminal activities is useful.

Before being incarcerated, plaintiff held the number three position of "consigliere"[2] for over eight years in a powerful Mafia crime family—the Genovese Crime Family.[3] (Declaration of Robert C. Stewart, October 2, 1992 at ¶ 28.) In the Northern New Jersey–New York Metropolitan area, the Genovese LCN Family has historically been one of the most powerful of the American Mafia criminal organizations. Today, the New Jersey contingent of the Genovese Family, through an entrenched network of racketeering operations, preys upon the transportation, shipping and construction industries. The Genovese LCN Family uses violence, intimidation and obstruction to further its organized criminal activities.

The single most efficacious law enforcement technique in combatting the LCN has been the utilization of historical materials in conjunction with electronic surveillance evidence. (*Id.* at ¶ 13.) The Federal Bureau of Investigation ("FBI") used electronic surveillance investigation to collect evidence regarding plaintiff's domination over New Jersey construction unions which eventually led to a successful prosecution. (*Id.* at ¶ 29.) In 1989, a jury in this District found plaintiff guilty of serious offenses including, but not limited to, offenses under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO") involving predicate violations of the Hobbs Act (extortion) and Taft–Hartley Act (bribery), organized gambling and three separate murder predicates relating to the affairs of the Genovese LCN Family. (*Id.* at 29.) The convictions for conspiracy to murder in aid of racketeering involved the planned murders of John and Gene Gotti, high-ranking members of another crime family, the "Gambino Family" of the LCN, and the notorious murder of Irwin Schiff, which was carried out on August 8, 1987 in a New York City restaurant. (*Id.* at ¶ 30.); *see United States v. Manna, et al.,* Cr. 88–239 (D.N.J. Oct. 12, 1989), *aff'd without opinion,* 919 F.2d 733 (3d Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1418, 113 L.Ed.2d 471 (1991). Following the conviction, Judge Barry sentenced plaintiff, then sixty years old, to a total of eighty (80) years imprisonment. (*Id.* at ¶ 31.) The court also imposed a fine of $250,000 and a special assessment of $350, immediately payable. (*Id.*)

By letter dated May 27, 1991 and addressed to the United States Attorney for the District of New Jersey, plaintiff made a general request for "all records in reference to [him]self" and specifically for "all records in regard to any electronic surveillance, whether legal or illegal" pursuant to the FOIA and the Privacy Act, 5 U.S.C. § 552a ("PA").[4] (Declaration of Virginia L. Wright, October 1, 1992 at ¶ 2.) The Executive Of-

---

2. The "consigliere" is a member of the second tier in the chain of command for an LCN crime family. *United States v. Pungitore,* 910 F.2d 1084, 1098 (3d Cir.1990) (citations omitted). The first tier is reserved for the "boss." The Third Circuit has explained that "[t]he consigliere functions as an advisor to the boss and assists in the settlement of disputes among members...." *Id.*

3. The existence of the Genovese LCN Family was described in the RICO case of *United States v. Tieri,* 80 Cr. 381 (S.D.N.Y.). On November 21, 1980, Frank "Funzi" Tieri was convicted of being the "boss" of that Family and of operating its affairs through a pattern of racketeering activity which involved predicate acts of murder, extor-

tion, loansharking, receipt of stolen property and bankruptcy fraud.

4. The Privacy Act establishes access for individuals to records of personal information maintained about them by the federal government. 5 U.S.C. § 552a. Except for arrest records, Section (j)(2) of the Privacy Act exempts from disclosure material reporting investigative efforts pertaining to the enforcement of criminal laws including efforts to prevent, control, or reduce crime and apprehend criminals. When Section (j)(2) of the Privacy Act, read in conjunction with 28 C.F.R. § 16.96, requires denying the requester access to criminal investigative files, Section (t)(2) of the Privacy Act mandates that the request also be processed pursuant to the FOIA.

fice for United States Attorneys ("EOUSA"),[5] in conjunction with the United States Attorney's Office, processed plaintiff's record request and located records responsive to his request (the "Responsive Records"). Defendants understood plaintiff's general request to mean records which refer to him by name (including nicknames and initials), records of his image (e.g. photographs) or voice (*e.g.* audio tapes) (Oct. 1, Wright Decl. at ¶ 9.) Defendants searched for the files compiled for the investigation and subsequent prosecution of plaintiff in the case captioned *United States v. Manna*, Cr. 88–239. (*Id.*) However, records which merely cited the case caption of plaintiff's criminal prosecution, but did not otherwise refer to plaintiff were excluded. (*Id.*)

On or about October 25, 1991, the EOUSA provided plaintiff with some of the Responsive Records and provided additional records on or about June 10, 1992 and September 30, 1992. (*See* Oct. 1, Wright Decl. ¶¶ 10–14 and Exhibits G, J & K attached thereto.)

Copies of the following Responsive Records were made available to plaintiff:

1. Trial transcripts in Criminal Action No. 88–239;

2. Trial exhibits in Criminal Action No. 88–239 (excluding tangible objects, which are not considered "agency records" under FOIA);

3. Pre-trial transcripts and motions, orders, judgments, notices of alibi, indictments, and correspondence in Criminal Action No. 88–239; and

4. Miscellaneous records which refer to plaintiff:

 a. Plaintiff's tax returns, other tax information, checks, money orders, bills, receipts and like documents;

b. Documents relating to proceedings holding plaintiff in contempt of the New Jersey State Commission of Investigation for refusal to answer questions pursuant to a subpoena;

c. An FBI arrest record for plaintiff;

d. Written statements of Vincent ("Fish") Cafaro;

e. Newspaper clippings and a June 28, 1988 press release from the United States Attorney's Office; and

f. Miscellaneous trial transcripts.

(*See* Oct. 1, Wright Decl. Exhibits G, J & K attached thereto).

Although other Responsive Records were found, defendants withheld them from plaintiff based on one of five grounds: (1) Exempted by 5 U.S.C. § 552(b)(7); (2) Title III Materials, (3) Grand Jury Materials, (4) Pen Register Materials and (5) Privileged Materials.[6]

Certain records which originated either from the FBI or the Bureau of Prisons ("BOP") were also withheld. Pursuant to 28 C.F.R. § 16.42[7] these documents were referred to the FBI and BOP respectively for review and a direct response to plaintiff. The FBI and BOP subsequently made their own determination as to which documents were disclosable. (*See* Dec. 16, 1992 Declaration of Michael D. Turner; Dec. 11, 1992 Declaration of Marcus Williams.) On November 10, 1992, the BOP forwarded seventeen pages to plaintiff with certain personal identifiers redacted. (Williams Decl. at ¶ 5.) Defendants released a copy of an FBI 1965 "rap sheet." (Def.Rpl.Let.Br. Jan. 6, 1993 at p. 3; *see also* Turner Decl. at ¶ 3, n. 2.) On October 21, 1992, the FBI also released to plaintiff seven documents, six with redac-

---

**5.** The EOUSA is a component of the Department of Justice located in the District of Columbia. The Freedom of Information Act/Privacy Act Unit of the EOUSA processes the FOIA requests directed to the United States Attorneys' Offices nationwide. (Oct. 1, Wright Decl. at ¶ 1.)

**6.** These categories are addressed below at length in the discussion section of this opinion.

**7.** When a component of the Department of Justice, *e.g.* separate bureau, office, board, division

etc., 28 C.F.R. § 16.42(c)(2), receives a request for records under the Privacy Act of 1974, the receiving component is primarily responsible for responding to the request. 28 C.F.R. § 16.42(a). If the request is for a record containing information which relates to an investigation of a possible violation of criminal law or to a criminal law enforcement proceeding and the record was generated by a component other than the receiving component, the receiving component is required to consult the other component before responding to the request. 28 C.F.R. § 16.42(c), (d).

tions, received from the EOUSA. (*Id.* at ¶ 15.)

By letter dated October 28, 1991, plaintiff appealed the EOUSA's disclosure determination to the Office of Information and Privacy ("OIP"). (Oct. 1, Wright Decl. at ¶ 11 and Exhibit H attached thereto.) By letter dated March 25, 1992, the OIP affirmed the EOUSA's disclosure determination and advised plaintiff that he had the option of a judicial review of his appeal in the United States District Court. (*Id.* at ¶ 12.)

On May 1, 1992, plaintiff filed this action for declaratory and injunctive relief under the Freedom of Information Act, 5 U.S.C. § 552, to compel defendants to produce all records in their possession and control which referred to him in connection with his criminal conviction. *See United States v. Manna*, Crim. No. 88–239 (D.N.J. Oct. 12, 1989), *aff'd without opinion*, 919 F.2d 733 (3d Cir.1990), *cert. denied*, ⸺ U.S. ⸺, 111 S.Ct. 1418 (1991).

In August 1992, plaintiff moved for an order directing the DOJ to provide an index of the withheld documents pursuant to *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir. 1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). The DOJ, cross-moved for dismissal of the Complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (b)(6). In an unpublished letter opinion filed August 24, 1992, I denied both motions. *Manna v. U.S. Dep't of Justice et al.*, Civ. No. 92–1840, slip op. (D.N.J. August 4, 1992). I concluded that granting plaintiff's motion for a *Vaughn* index would be premature in light of defendants' intention to move promptly for summary judgment. I reasoned that a summary judgment might moot the need for a *Vaughn* index. *Id.* at 2. Moreover, a *Vaughn* index in this case might present the same risks that production of the underlying documents would present. *Id.* Lastly, I denied defendants' motion to dismiss after rejecting defendants' argument that plaintiff failed to sue the agency as opposed to a federal officer. *Id.* at 3.

## DISCUSSION

### A. FOIA EXEMPTIONS

■ The Supreme Court has recognized that the FOIA sets forth a policy of broad disclosure of government documents in order " 'to ensure an informed citizenry, vital to the functioning of a democratic society.' " *FBI v. Abramson*, 456 U.S. 615, 621, 102 S.Ct. 2054, 2059, 72 L.Ed.2d 376 (1982) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978)). As a result, the FOIA requires federal agencies to make promptly available any records requested of it by any person so long as the request "reasonably describes such records." *Landano v. U.S. Dep't of Justice et al.*, 956 F.2d 422, 425 (3d Cir.1992) (quoting 5 U.S.C. § 552(a)(3)). If an agency improperly withholds the requested documents, a federal district court may order production. *Id.* However, there are nine specific exemption categories that justify an agency's withholding documents. *Id.; see* 5 U.S.C. § 552(b)(7). Since "[t]he Act creates a presumption in favor of disclosure," the agency has the burden of demonstrating that a statutory exemption is applicable. *See Ferri v. Bell*, 645 F.2d 1213, 1221 (3d Cir.1981), *modified on other grounds* 671 F.2d 769 (3d Cir.1982); *Committee on Masonic Homes of the R.W. Grand Lodge v. NLRB*, 556 F.2d 214, 218 (3d Cir.1977).

The documents withheld from plaintiff fall into the following FOIA exemption categories: Exemption 7, Exemption 3 and Exemption 5. These categories and the documents defendants claim they protect from disclosure will be discussed seriatim.

*Exemption 7 Materials*

Defendants assert that some of the documents they seek to withhold from plaintiff are exempted by FOIA Exemptions 7(A), 7(C) and 7(F) which provide:

(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information

(A) could reasonably be expected to interfere with enforcement proceedings . . .

(C) could reasonably be expected to constitute an unwarranted invasion of personal privacy . . .

(F) could reasonably be expected to endanger the life or physical safety of any individual. . . .

5 U.S.C. 552(b)(7)(A), (C) & (F).

"The language of the Exemption indicates that judicial review of an asserted Exemption 7 privilege, requires a two-part inquiry. First, a requested document must be shown to have been an investigatory record 'compiled for law enforcement purposes.' If so, the agency must demonstrate that release of the material would have one of the six results specified in the Act." *FBI v. Abramson*, 456 U.S. at 621, 102 S.Ct. at 2059 (quoting 5 U.S.C. § 552(b)(7)).

■ Affidavits submitted to the court supporting the agency's decision to withhold documents must contain more than general and conclusory language. *Ferri v. Bell*, 645 F.2d at 1221. Rather, the affidavit must provide a relatively detailed analysis in manageable segments of the basis for the claimed exemption. *Id. (citing Vaughn v. Rosen*, 484 F.2d 820, 826 (D.C.Cir.1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974)). If the affidavits are sufficiently detailed, the district court is not required to look further. *Lewis v. I.R.S.*, 823 F.2d 375, 378 (9th Cir.1987). The agency "need not specify its objections [to disclosure] in such detail as to compromise the secrecy of the information." *Lewis*, 823 F.2d at 377 (quoting *Church of Scientology v. United States Dep't of the Army*, 611 F.2d 738, 742 (9th Cir.1979)). "But if the affidavits are 'too generalized,' the district court may, *in its discretion*, examine the disputed documents *in camera* in order to make 'a first-hand determination of their exempt status.'" *Lewis*, 823 F.2d at 378 (emphasis in original). However, *in camera* inspection should not be

resorted to lightly.[8] *Id.; see Vaughn v. Rosen*, 484 F.2d 820, 825 (D.C.Cir.1973).

In support of its motion, defendants have provided the declarations of Robert C. Stewart, an Assistant United States Attorney and Chief of the Organized Crime Strike Force Division of the United States Attorney's Office for the District of New Jersey, the declarations of Virginia L. Wright, a supervisory paralegal specialist for the EOUSA, the declarations of Evelyn F. Block, a paralegal specialist employed by the Office of the United States Attorney for the District of New Jersey, the declarations of Robert M. Hanna, an Assistant United States Attorney for the District of New Jersey, the declaration of Marcus Williams, an Attorney–Advisor in the Employment Law and Information Branch of the Office of General Counsel for the Federal Bureau of Prisons and the declaration of Michael D. Turner, a Special Agent assigned to the Freedom of Information–Privacy Acts Section of the Information Management Division at FBI Headquarters ("FBIHQ") in Washington, D.C.

i. *Exemption 7(A)*

■ Section (b)(7)(A) exempts from disclosure "investigatory records compiled for law enforcement purposes" when production of such records would "interfere with enforcement proceedings." *Docal v. Bennsinger*, 543 F.Supp. 38, 44 (M.D.Pa.1981). It is well recognized that, pursuant to this exemption, an agency may withhold documents stemming from an ongoing criminal investigation if disclosure would harm or interfere [9] with a subsequent enforcement proceeding. *Id.* Exemption 7(A) is "intended to prevent premature disclosure of the investigatory materials which might be used in a law en-

---

**8.** "Before the court orders *in camera* inspection, the Government should be given the opportunity to establish by means of testimony or detailed affidavits that the documents are clearly exempt from disclosure. The burden remains on the Government under this law." S.Rep. No. 1200, 93d Cong., 2d Sess. 9, *reprinted in* 1974 U.S.C.C.A.N. 6267, 6287–88.

**9.** "'Interference' under the terms of the statute encompasses a wide range of concerns. Grounds which have been repeatedly acknowledge by the courts include fears of disclosure of:

(1) evidence, (2) witnesses, (3) prospective testimony, (4) the reliance placed by the government upon the evidence, (5) the transactions being investigated, (6) the direction of the investigation, (7) government strategy, (8) confidential informants, (9) the scope and limits of the government's investigation, (10) prosecutive new defendants, (11) materials protected by the Jencks Act, (12) attorney work product, (13) the methods of surveillance, [and] (14) subjects of surveillance." *Docal v. Bennsinger*, 543 F.Supp. at 44 n. 12.

forcement action." *FBI v. Abramson*, 456 U.S. at 621, 102 S.Ct. at 2059. Determinations of "interference" need not be done on a case-by-case basis. *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. at 223, 98 S.Ct. at 2317. Rather, an agency may rely on a generic approach by grouping documents into categories that are

> sufficiently distinct to allow a court to grasp "how each ... category of documents, if disclosed, would interfere with the investigation." *Campbell [v. Department of Health & Human Services]*, 682 F.2d [256] at 265 [ (D.C.Cir.1982) ]. The hallmark of an acceptable category is thus that it is *functional;* it allows the court to trace a rational link between the nature of the document and the alleged likely inference.

*Bevis*, 801 F.2d at 1389 (quoting *Crooker v. Bureau of Alcohol, Tobacco and Firearms*, 789 F.2d 64, 67 (D.C.Cir.1986)) (emphasis in original). When an agency elects the generic approach, the agency must satisfy a tripartite standard. *See Bevis v. United States Dep't of State*, 801 F.2d 1386, 1389–90 (D.C.Cir. 1986). "First, it must define its categories functionally. Second, it must conduct a document-by-document review in order to assign documents to the proper category. Finally, it must explain to the court how the release of each category would interfere with enforcement proceedings." *Id.* at 1389–90.

For most of the documents, defendants have met the *Bevis* tripartite standard. The declarations submitted in support of defendants' summary judgment motion functionally group the documents in the following defined categories: FBI Reports, Labor Reports, Surveillance Records, Privileged Materials, BOP Materials *etc.* The declarants have conducted a document-by-document review and assigned documents to a particular category. Lastly, they have explained how the release of the documents in each category would interfere with law enforcement proceedings. In the few instances where a declarant has failed to do so, summary judgment has been denied.

Based on the October 2, 1992 and December 18, 1992 Stewart Declarations and the November 18, 1992 Sealed Declaration, de-fendants have adequately met their burden of showing that the following documents are justifiedly withheld based on Exemption 7(A):

a. *FBI Reports 1 through 8* contain the results of interviews which were conducted in connection with a particular gangland slaying as to which plaintiff and others are suspects (Oct. 2, Stewart Decl. at ¶ 38.) This homicide investigation is one of several Genovese family homicides which remain unprosecuted, but not inactive. (*Id.*) Some of the information deals with the potential motive for the murders. (*Id.*)

b. *FBI Reports 9 through 12, 15 and 16* are interviews relating to plaintiff's and the Genovese Family's improper influence with organized labor. (*Id.* at ¶ 39.) Related and derivative investigations are still open and pending. Some of those interviewed are innocent citizens who fall into the category of victims. Other interviewees who are more loyal to plaintiff have provided useful information and are most apt to appear in future trials as defense witnesses.

c. *FBI Report 14* contains the statements of two persons who are potential witnesses with respect to a suspected extortion. (*Id.* at ¶ 41.) There is reason to suspect that these persons participated in crimes with plaintiff and the Genovese LCN Family. These statements contain information regarding crimes still under investigation.

d. *FBI Reports 17 and 18* are the statements of innocent citizens about certain business transactions and relationships. (*Id.* at ¶ 42.)

e. *FBI Report 19* contains information from an individual who can place certain organized crime figures in a particular location with respect to the successors of the Manna–Related Investigations. (*Id.* at ¶ 43.)

f. *FBI Reports 20, 21 and 22* are interviews of sensitive sources regarding a suspected episode involving plaintiff's obstruction of justice. The investigation is ongoing. (*Id.* at ¶ 44.)

g. *FBI Reports 23 and 24* also contain the statements of two individuals concerning a particular suspected obstruction of justice by plaintiff. (*Id.* at ¶ 45.) The investigation into this obstruction remains open.

h. *FBI Reports A and B* contain the statements of plaintiff's co-defendants at the time of his arrest. (*Id.* at ¶ 46.) They were not used at trial and are not *Brady* material as to Manna. Both reports contain information about the Genovese LCN Family's influence within organized labor. Investigations in this area are active.

i. *FBI Report C* comprise two entries of information provided to the FBI by a confidential source. (*Id.* at ¶ 42.) Although the name of the source is "blacked out," plaintiff may be able to identify him from the content of the documents because the source testified at plaintiff's trial. The two entries contain information about the New Jersey Branch of the Genovese LCN Family's operations and criminal activity. This information is relevant to an open investigation.

j. *FBI Report 101* contains an interviewee's statement about crimes which still have the potential for prosecution. (Dec. 18, Stewart Decl. at ¶ 11.)

k. *FBI Report 102* is a report of an interview of a long-time Genovese LCN Family associate. He has identified individual suspects, transactions and locations of certain transactions. This interviewee participated in crimes with plaintiff. Active investigation is being pursued. Disclosure of the interviewee would not only jeopardize the investigation, but also could result in severe retaliation. (*Id.* at ¶ 12.)

l. *FBI Report 103* contains an interviewee's statement about the interviewee's participation in criminal activity and possible participation in organized criminal activity with plaintiff and/or plaintiff's white collar associates. (*Id.* at ¶ 13).

m. *FBI Reports 204* [10] comprise periodic (usually quarterly) reports (approx. 79 documents) [11] which synopsize and provide varying degrees of detailed information about the state of an investigation dating from 1961 to 1973. These documents are studied today to determine whether any patterns of criminal activity have taken place.[12] (*Id.* at ¶ 15.) Theses documents could be used for obstructing justice. (*Id.* at ¶ 16.) These documents include informant information, (*Id.* at ¶ 17(a)), named citizens who are either victims of organized crime, participants in criminal activity or associates of suspects under investigation (*Id.* at ¶ 17(b)), identification of accomplices who are subject of investigations (*Id.* at ¶ 17(c)), names from toll records and Department of Motor Vehicle files (*Id.* at ¶ 17(d)) and reports from unsolved homicides or violent crimes. (*Id.* at ¶ 17(e).) Hence, document numbers F1–F66 [13] excluding F64 of the FBI Reports 204 are protected by exemption 7(A).

n. *Labor Report 1* contains information about the hierarchy of the Genovese Crime Family, the activities of plaintiff's colleagues and an unsolved homicide. Twelve individuals are mentioned in this report. (*Id.* at ¶ 18.)

---

**10.** According to one of the Stewart Declarations, for reasons unknown, some reports appear to be missing altogether and others appear to be lacking all pages except the first page which contains a synopsis. (Dec. 18, Stewart Decl. at ¶ 14.)

**11.** Thirteen of these documents are not part of the defendants' summary judgment request, but are being further evaluated by the government.

**12.** For example, Manna's criminal activities on behalf of the Genovese Crime Family during the late 1950's and early 1960's became important evidence in a civil RICO action over twenty years later in proving that the Genovese Family dominated a labor union. (Dec. 18, Stewart Decl. at ¶ 15.) (citing *United States v. Local 560 (I.B.T.), et al.*, 581 F.Supp. 279, 304–05 (D.N.J.1984)).

**13.** These documents are referred to as documents 1 through 66 in paragraph 17 of the December 18, 1992 Stewart Declaration. In order to avoid confusion with documents 1 through 24 enumerated in the October 2, 1992 Stewart Declaration, the letter F is added as a prefix to the documents enumerated in the December 18, 1992 declaration.

o. *Labor Report 2* explains the status of a number of investigations, discloses connections and reveals the extent of law enforcement's knowledge. (*Id.* at ¶ 19.) Defendants must disclose any investigative information that has resulted in a prosecution unless this information is being relied upon to bring subsequent prosecutions or the information is so inextricably intertwined with other confidential information such that it is impracticable to separate.

p. *Surveillance Records* in which plaintiff was either observed, overheard or mentioned. These records are intended to be used as evidence in an anticipated legal action. (Oct. 2, Stewart Decl. at ¶ 51–52; Nov. 18, Sealed Decl. at ¶ 10.)

q. *Miscellaneous Records* Lastly, a statement of a co-defendant of plaintiff, purportedly made under the influence of a "chemo-hypnotic medium." (*Id.* at ¶ 53.)

■ Defendants have submitted sufficient evidence that these documents are instrumental to proceedings anticipated in the near future. A declaration filed under seal by defendants states that the declarant has read Mr. Stewart's October 2, 1992 declaration concerning Exemption 7 Materials, (*see* categories a.–h. *infra*), believes that more legal proceedings are forthcoming and believes that the Exemption 7 Materials "could reasonably be expected to interfere with law enforcement proceedings described in the Stewart Declaration." (November 19, 1992 Sealed Declaration at ¶¶ 7–10.) In fact on Monday, February 1, 1993, a substantial criminal trial commenced before Judge Barry against several alleged powerful members of the Genovese LCN Family. *See United States v. Lombardi, et al.,* Cr. 92–171. The principal defendant in that RICO prosecution, Salvator "Sally Dogs" Lombardi, allegedly inherited a substantial portion of the Genovese LCN Family criminal operations formerly controlled by Manna, including labor racketeering and construction industry extortions.

The Stewart Declarations elaborate on how disclosure of the information will have a profoundly negative effect on upcoming legal proceedings and on individuals who have assisted law enforcement personnel. Release of certain information will aid the Genovese LCN Family in obstructing justice by enabling them to determine the extent of law enforcement knowledge, uncover law enforcement strategy and anticipate upcoming civil RICO and criminal actions. The declarations explain that the LCN, specifically the Genovese LCN Family, has a long, sordid and bloody history of racketeer domination and exploitation. Plaintiff, although physically confined in a penitentiary, has not severed his ties to the Genovese Crime Family. Because the LCN is so violent and retaliatory, the names of interviewees, informants, witnesses, victims and law enforcement personnel must be protected. Everyone of the major LCN leadership level defectors in recent years has stated and/or testified that only slight suspicion is needed before deciding to kill a suspected informant. With very few exceptions, the mere accusation by a member in good standing is sufficient to precipitate the issuance of a death warrant from the hierarchy. Moreover, disclosure of FBI reports could result in a chilling effect upon potential cooperators and witnesses in organized crime enforcement investigations. A wall of silence will impede the criminal justice system while benefiting the perpetuation of organized crime. (Oct. 2, Stewart Decl. at ¶ 48.) Mr. Stewart explains that the chain of on-going prosecutions concerning organized crime could be broken by disclosure of the FBI Reports. Lastly, a number of these witnesses are of limited means and cannot afford to protect their families by relocating. Under *Docal v. Bennsinger,* all of these reasons are recognized by federal courts as legitimate reasons for non-disclosure. *See* 543 F.Supp. at 44 n. 12; *see supra* at n. 5. Therefore, granting summary judgment in defendants' favor is proper with respect to the documents listed above.

ii. *Exemption 7(C)*

Exemption 7(C) requires a *de novo* balancing of the privacy interests against public interests. *Department of Justice v. Reporters Committee for Freedom of the Press,* 489 U.S. 749, 762, 109 S.Ct. 1468, 1476, 103 L.Ed.2d 774 (1939); *Landano v. Department of Justice,* 956 F.2d 422, 425–26 (3d Cir.1992).

The Third Circuit has held that "individuals who are associated with a criminal investigation have a privacy interest under Exemption 7(C) of the FOIA such that the government may be justified in refusing to disclose their names." *Landano*, 956 F.2d at 427. Suspects, witnesses, interviewees, and investigators have been held to possess privacy interests under Exemption 7(C). *Id.* at 426. The Third Circuit has noted that suspects in an investigation have the most obvious privacy interest in not having their identities revealed. *Id.* In addition, disclosure of interviewees and witnesses may result in embarrassment and harassment. *Id.* "Criminal investigations turn up a myriad of details about the personal lives of witnesses and interviewees and for some, disclosure of the fact of cooperation." *Id.* Even law enforcement personnel possess a privacy interest under Exemption 7(C) in not having their identities disclosed. *Id.* "While the privacy interests of those involved in a criminal investigation may become diluted by the passage of time, several courts have recognized that the potential for embarrassment and harassment may endure for many years." *Id.* at 427.

■ The following documents are not subject to disclosure because the privacy interest and/or potential for embarrassment/harassment of the interviewee, informant or law enforcement officer outweighs the public interest in disclosing their names:

a. *FBI Report 13* contains the result of an interview concerning an alleged murder contract which was never carried out, if indeed it ever existed. (Oct. 2, Stewart Decl. at ¶ 40.) The investigation is closed, but it is not a matter of public record. This document merely mentions plaintiff tangentially.

b. *Miscellaneous Records* one page redacted letter to a planned prosecution witness. (*Id.* at ¶ 54.)

c. *FBI Reports* listed in categories a. through m. above under Exemption 7(A) materials.

d. *Litigation Worksheets* listing law enforcement personnel responsible for executing arrests, executing search warrants and being available during the *Manna* proceedings. (Dec. 18, Stewart Decl. at ¶ 23(d).)

e. *FBI Reports 204* specifically F1–F6, F8–F14, F17, F20, F23A, F24–F27, F31–F35, F38–F40, F44, F47–F50, F53–57, F59, F61, F63, F65–F66 (Dec. 18, Stewart Decl. at ¶ 17(a), (b), (d).)

f. *Identification Numbers* of persons, *e.g.* social security numbers and drivers license numbers. (Dec. 11, 1992, Marcus Williams Decl. ¶¶ 3–5).

Because the LCN is so violent and retaliatory, the names of interviewees, informants, witnesses, victims and law enforcement personnel must be safeguarded. *See supra* pp. 808–809. Plaintiff has not asserted any public interest that these private interests should be weighed against.[14] Plaintiff has only asserted his own personal interest in having his "illegal conviction" overturned. Without providing a legitimate public interest, plaintiff is not entitled to a copy of these documents. *See U.S. Dep't of State v. Ray*, —— U.S. ——, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991).

■ Plaintiff nonetheless urges this court to focus on whether the privacy interest promotes the purposes of the FOIA rather than the particular purpose for which the document is being requested. (Pl.Resp.Br. at 3.) Although the general rule is that neither the purpose for which the request is made nor the identity of the requester can determine whether documents should be disclosed, *see Landano v. U.S. Dep't of Justice*, 956 F.2d at 428; *United States Dep't of State v. Ray*, —— U.S. ——, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991); *United States Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 771, 109 S.Ct. 1468, 1480, 103 L.Ed.2d 774, 794 (1989), the facts in this

14. Plaintiff directs the court's attention to *The Globe Newspaper Co. and Kevin Cullen v. FBI*, Civ. Act. No. 91–13257–Z, 1992 WL 396327 (D.Mass. Dec. 29, 1992) where the court ordered the government to honor the plaintiff's FOIA request. The *Globe* case is easily distinguishable from the case at bar because there the court found a public interest, *Id.* at 11–12, that outweighed the individual privacy interest which the court concluded was *de minimis*. *Id.* at 10.

case necessitate a departure from this general rule. I cannot overlook the fact that plaintiff has been sentenced to 80 years in prison for murder and his participation in organized crime as a leader within one of the most powerful organized LCN families in the nation. Indeed, the Third Circuit has recognized that a LCN Family counts on "its well-founded reputation for achieving its objectives through violent means." *United States v. Pungitore*, 910 F.2d 1084, 1098 (3d Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991). Releasing the names of people who assisted in the apprehension of organized crime participants would make the assistors unnecessarily vulnerable to possible harassment and retaliation.

 Now turning to the documents/information described in the declarations of Michael D. Turner and Marcus Williams, I find that only the information in the Williams Declaration is exempt from disclosure. The Turner Declaration lacks the requisite specificity to grant summary judgment. The Turner Declaration only covers eight documents, yet a document-by-document method of evaluation was not employed. For a declaration evaluating so few documents, each document or the portion contained therein sought to be protected should have been cross-referenced to the statutory provision that allegedly provides the protection. Finally, the Turner Declaration provides no factual justification for the withholding. Instead, the declaration heavily relies on conclusory statements and the citations of statutes. More facts are needed about the documents themselves and an explanation how the release of the information would violate the privacy interests, interfere with ongoing investigations or pose a potential risk to certain individuals. Due to these inadequacies, summary judgment is denied with respect to the documents and/or the redactions described in the Turner declaration.

### iii. *Exemption 7(F)*

 Exemption 7(F) permits the withholding of law enforcement records where disclosure could reasonably be expected to "endanger the life or physical safety of any individual...." 5 U.S.C. § 552(b)(7)(F). Considering the broad language of the phrase "any individual" in conjunction with the violent and murderous nature of plaintiff and the Genovese LCN Family with which he is associated, the FBI Reports 1–10, 14–24, A–C, 101–03, F1–F6, F8–F14, F17, F20, F23A, F24–F27, F31–F35, F38–F40, F44, F47–F50, F53–57, F59, F61, F63, F65–F66 (Dec. 18, Stewart Decl. at ¶ 17(a), (b), (d)) and the two Miscellaneous Records are exempt from disclosure (Oct. 2, Stewart Decl. at ¶ 53).

### *Exemption 3*

Exemption 3 shields information "specifically exempted from disclosure by statute ..., provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). Defendants assert that certain wiretap materials, Grand Jury materials and pen register materials were properly withheld from plaintiff because they are protected by statutes that are recognized under Exemption 3.

### i. *Title III Materials*

Congress enacted the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), *see* 18 U.S.C. §§ 2510–20, to comprehensively and stringently regulate the interception of wire, oral and electronic communications. *Lam Lek Chong v. DEA*, 929 F.2d 729, 732 (D.C.Cir.1991); *see Gelbard v. United States*, 408 U.S. 41, 46, 92 S.Ct. 2357, 2360, 33 L.Ed.2d 179 (1972). Title III has several prominent purposes:

(1) "to prohibit, on the pain of criminal and civil penalties, all interceptions ..., except those specifically provided for ..., most notably those interceptions permitted by law enforcement officers when authorized by court order ..." *United States v. Giordano*, 416 U.S. 505, 514, [94 S.Ct. 1820, 1826, 40 L.Ed.2d 341] (1974);

(2) to specify the limited circumstances the fruits of court-authorized interceptions

may be used or disclosed, *Lam Lek Chong v. DEA,* 929 F.2d at 731; and (3) "to ensure the reliability and integrity of evidence obtained by means of electronic surveillance...." *United States v. Ojeda Rios,* 495 U.S. 257, 263 [110 S.Ct. 1845, 1849, 109 L.Ed.2d 224] (1990).

■ Title III has been held to fall squarely within the scope of Exemption 3. *Lam Lek Chong,* 929 F.2d at 733; *Docal v. Bennsinger,* 543 F.Supp. 38, 43–44 (M.D.Pa. 1981). In *Lam Lek Chong v. DEA,* the Court of Appeals for the District of Columbia explained that "[o]n its face, Title III clearly identifies intercepted communications as the subject of its disclosure limitation." *Id.* at 733 (citing 18 U.S.C. § 2517). The *Lam Lek Chong* court concluded that Title III was in accordance with subsection (B) of Exemption 3 because Congress manifested a determination that certain specified materials should remain confidential. *Id.* at 733. Section 2517 under Title III allows disclosure only in three circumstances:

(1) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication, or evidence derived therefrom, may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving disclosure.

(2) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication or evidence derived therefrom may use such contents to the extent such use is appropriate to the proper performance of his official duties.

(3) Any person who has received, by any means authorized by this chapter, any information concerning a wire, oral, or electronic communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof.

18 U.S.C. § 2517.

Not only are these records memorializing the interceptions protected, but so are the applications made and the court orders granted for the interceptions. Section 2518(8)(b) provides that applications and orders under Title III shall be sealed by a judge and disclosed only upon a showing of good cause:

Applications made and orders granted under this chapter shall be sealed by the judge. Custody of the applications and orders shall be wherever the judge directs. Such applications and orders shall be disclosed only upon a showing of good cause before a judge of competent jurisdiction and shall not be destroyed except on order of the issuing or denying judge, and in any event shall be kept for ten years.

18 U.S.C. § 2518(8)(b). Disclosure in violation of Section 2518(8)(b) is punishable by contempt. 18 U.S.C. § (8)(c). The legislative history of Section 2518(8)(b) clearly indicates Congress' desire for confidential treatment of Title III applications and orders:

Subparagraph (b) provides that applications and orders for authorization shall be treated confidentially. Particularly in renewal situations, they may be expected to contain sensitive information. The provision requires them to be sealed and kept wherever the judge directs, which would normally be with the records themselves. Applications and orders may not be disclosed except incidental to the disclosure or use of the records themselves after showing of good cause, for example, under (10)(a), discussed below. Applications and orders may not be destroyed except on a court order and must be kept for at least 10 years.

S.Rep. No. 1097 (1968), *reprinted in,* 1968 U.S.C.C.A.N. 2112, 2194.

Interceptions of communications by the FBI pursuant to Title III and pursuant to the order of Judge Harold A. Ackerman (Miscellaneous Doc. Nos. 87–198 and 87–392)

are protected by Exemption 3. According to defendants, these interceptions were taken in 1987 and 1988 in New Jersey—Casella's Restaurant, 615 First Street, Hoboken, New Jersey and the Village Coffee Shop, 359 2nd Street, Jersey City, New Jersey. (Oct. 2 Stewart Decl. at ¶ 55.) The records consist of the recordings of the interceptions, documents transcribing the contents of the interceptions and the applications, which were made at roughly one-month intervals over the course of a year and the orders granting the interceptions. (*Id.*)

The other Title III documents defendants seek to protect are pen register materials. The Electronic Communications Privacy Act under Title III of the Omnibus Crime Control and Safe Street Act of 1968 generally protects against the unauthorized interception of electronic communications. S.REP. No. 541, 99th Cong. (1986), *reprinted in*, 1986 U.S.C.C.A.N. 3555. However, an exception to this rule is when the interception is permitted by court order and related to a criminal investigation.

Defendants also seek to protect materials from pen registers which are devices that identify phone numbers dialed from a particular phone by recording or decoding electronic or other impulses. *See* 18 U.S.C. § 3127(3).[15] Pen registers can only be installed after obtaining a court order. An attorney for the federal government, a state investigative or law enforcement officer permitted by state law may make an application for a pen register. 18 U.S.C. § 3122. A court may enter an *ex parte* order authorizing the installation and use of a pen register if a certification is submitted that states that the information sought is relevant to an ongoing criminal investigation. 18 U.S.C. § 3123. The order may direct a third party to furnish information, facilities and technical assistance necessary to install the pen register. 18 U.S.C. § 3123(b)(2). Section 3123(d)

provides that once ordered, the existence of the pen register cannot be disclosed without the court's permission. Section 3123(d) reads in pertinent part:

(d) **Nondisclosure of existence of pen register** ...—An order authorizing or approving the installation and use of a pen register ... shall direct that

(1) the order be sealed until otherwise ordered by the court; and

(2) the person owning or leasing the line to which the pen register ... is attached, or who has been ordered by the court to provide assistance to the applicant, not disclose the existence of the pen register ... or the existence of the investigation to the listed subscriber, or to any other person, unless or until otherwise ordered by the court.

18 U.S.C. § 3123(d).

The pen register materials defendants seek to withhold are two sealed applications submitted to the court for the installation and use of pen registers on a Jersey City, New Jersey phone line.[16] (Oct. 2, 1992 Stewart Decl. at ¶ 57.) The other two documents are two orders issued by the Magistrate Judge who granted the applications. (*Id.*) All four documents are protected by Section 3123(d) and Exemption 3 under FOIA.

ii. *Grand Jury Materials*

■ Like Title III, Rule 6(e) of the Federal Rules of Criminal Procedure is a recognized statute under Exemption 3. *See, e.g., Garside v. Webster*, 733 F.Supp. 1142, 1147 (S.D.Ohio 1989); *Fund for Constitutional Government v. National Archives & Records Serv.*, 656 F.2d 856, 867–68 (D.C.Cir.1981). Rule 6(e) states in pertinent part:

(2) General Rule of Secrecy.—A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist, who transcribes recorded testimony, an attor-

---

**15.** Pen registers only record the telephone numbers dialed, not the actual content of the communications. S.REP. No. 541, 99th Cong. (1986), *reprinted in*, 1986 U.S.C.C.A.N. at 3600.

**16.** Plaintiff states that an illegal electronic surveillance was conducted at his residence in New York. (Oct. 17, 1992 Manna Decl. at ¶ 8; Dec.

24, 1992 Manna Decl. at ¶ 5.) However, the materials defendants seek to protect are for surveillance conducted in New Jersey (*See* Oct. 2, 1992 Stewart Aff. at ¶ 51, 55, 57.) Plaintiff provides no explanation why an alleged illegal electronic surveillance in New York has any bearing on the disclosure of materials concerning New Jersey surveillance.

ney for the government, or any person to whom disclosure is made under paragraph (3)(A)(ii) of this subdivision [*i.e.*, government personnel assisting the attorney in the performance of such government attorney's duties] shall not disclose matters occurring before the grand jury....

Fed.R.Crim.P. 6(e)(2). Courts have recognized that releasing grand jury investigatory information may discourage full discussion, conscientious voting and participation among the jurors. *Matter of Wade*, 969 F.2d 241, 246 (7th Cir.1992). Therefore the need for secrecy does not end with the investigation. *Id.*

Although disclosure of matters occurring before the grand jury is the exception and not the rule. *Fund For Constitutional Gov.*, 656 F.2d at 868, "there is no *per se* rule against disclosure of any and all information which has reached the grand jury chambers...." *Senate of Com. of Puerto Rico on Behalf of Judiciary Committee v. U.S. Dep't of Justice*, 823 F.2d 574, 582 (D.C.Cir.1987). "[T]he touchstone is whether disclosure would 'tend to reveal some secret aspect of the grand jury's investigation' and such matters as 'the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or question of jurors, and the like'." *Id.* (quoting Memorandum Opinion, C.A. No. 84–1829, at 5 (D.D.C. Feb. 7, 1986)). For example, documents subpoenaed by a grand jury may not be exempt if they are created for purposes independent and unrelated to the grand jury investigation. *See SEC v. Dresser Indus., Inc.*, 628 F.2d 1368 (D.C.Cir.) (*en banc*), *cert. denied*, 449 U.S. 993, 101 S.Ct. 529, 66 L.Ed.2d 289 (1980).

Rule 6(e) sets forth the circumstances and conditions under which Grand Jury information may be disclosed. *Id.; see* S.Rep. No. 354, 95th Cong. 1st Sess. 7–8 (1977). "Any disclosure to persons outside of the government may only be made pursuant to a court order." *Id.* (citing Fed.R.Crim.P. 6(e)(3)(C)).

The Grand Jury Materials that defendants seek to protect consist of transcripts of proceedings before federal grand juries, documents setting forth the names of actual or potential witnesses, and documents describ-

ing matters before the grand jury. (Oct. 2, Stewart Decl. at ¶ 56.) Defendants claim that none of the matters sought to be withheld is an exhibit prepared independently of the grand jury process. Based on Rule 6(e), the transcripts, the names of actual or potential witnesses and the description of the documents "describing matters before the grand jury" are protected. Therefore, Exemption 3 applies here and summary judgment is granted with respect to these documents. *See Senate of Puerto Rico*, 823 F.2d at 582; *Matter of Wade*, 969 F.2d at 246 (transcripts of witness "testimony before the grand jury [are] exactly the documents protected by ... exception [3]").

■ The Stewart Declaration states that the two entries were turned over to defense counsel during plaintiff's trial as *Jencks* material. Indeed, Mr. Stewart concedes that plaintiff may already have a copy. (Oct. 2, Stewart Decl. ¶ 47.) Plaintiff argues that since he was entitled to a copy during trial, these documents are not protected by a FOIA exception. (Louis Anthony Manna Declaration filed October 22, 1992 at ¶¶ 4–5.) In *Garside v. Webster*, 733 F.Supp. 1142 (S.D.Ohio 1989), the court expressly rejected this argument by writing:

> [T]he fact that ... [Grand Jury] material was made available to the plaintiff at his criminal trial is irrelevant because under FOIA, the right of th[e] plaintiff to receive requested information under 5 U.S.C. § 552 is as a member of the general public, no more, no less.

733 F.Supp. at 1147. Disclosure of information during the course of a criminal proceedings does not constitute a waiver of a FOIA exemption. *Id.; Irons v. FBI*, 880 F.2d 1446, 1452 (1st Cir.1989); *Erb v. Department of Justice*, 572 F.Supp. 954, 956 (W.D.Mich. 1983). Based on *Garside* and other established case law, plaintiff's request is denied.

*Exemption 5*

Exemption 5 allows the withholding of "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption prevents the public from hav-

ing documents " 'which a private party could not discover in litigation with the agency.' " *Conoco Inc. v. United States Dep't of Justice*, 687 F.2d 724, 727 (3d Cir.1982) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 148, 95 S.Ct. 1504, 1515, 44 L.Ed.2d 29 (1975)). Exemption 5 has been interpreted as preserving privileges such as the attorney-client privilege, the attorney work-product privilege and the deliberative process privilege, also referred to as the executive privilege. *Schell v. U.S. Dep't of Health & Human Servs.*, 843 F.2d 933, 939 (6th Cir.1988). The government claims that all three privileges are at issue in the present case.

### i. Attorney–Client Privilege

 It is well settled that the attorney-client privilege protects confidential communications. *U.S. v. Zolin*, 491 U.S. 554, 562, 109 S.Ct. 2619, 2625–26, 105 L.Ed.2d 469 (1989). "The privilege extends to verbal statements, documents and tangible objects conveyed by both individual and corporate clients to an attorney in confidence for the purpose of any legal advice." *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 90 (3d Cir. 1992) (citing 8 John H. Wigmore, *Evidence* § 2292 (John T. McNaughton rev. ed. 1961)); *accord United States v. Rockwell Int'l*, 897 F.2d 1255, 1264 (3d Cir.1990). The primary purpose of the privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of the law and administration of justice." *Haines*, 975 F.2d at 90 (quoting *Upjohn Co. v. U.S.*, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981)); *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976). To achieve this result, the client must feel free to make full disclosure to an attorney of prior wrongdoings, in order for the attorney to adequately represent him or her. *Haines*, 975 F.2d at 90. Since the privilege has the effect of withholding relevant factual information, it is narrowly applied. *Fisher v. United States*, 425 U.S. at 403, 96 S.Ct. at 1577. "The privilege does not apply to communications that are intended to be disclosed to third parties or that in fact are so disclosed." *Rockwell*, 897 F.2d at 1265. A disclosure of any meaningful part of the purported privileged communication can waive the privilege with respect to the whole. *Id.*

### ii. Work–Product Doctrine

 The work-product doctrine is designed to protect materials prepared by an attorney acting for his client in anticipation of litigation. *Rockwell*, 897 F.2d at 1265. For the doctrine to apply, the material must be prepared in anticipation of litigation and not " 'in the ordinary course of business, or pursuant to public requirements unrelated to litigation.' " *Id.* at 1265–66 (citing *United States v. El Paso*, 682 F.2d 530, 542 (5th Cir.1982), *cert. denied*, 466 U.S. 944, 104 S.Ct. 1927, 80 L.Ed.2d 473 (1984)). In the Third Circuit, a court must determine whether " 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prosect of litigation'." *Rockwell*, 897 F.2d at 1266 (quoting *In re Grand Jury Proceedings*, 604 F.2d 798, 803 (3d Cir.1979)). Under the FOIA's Exemption 5, "[t]he work product privilege simply does not distinguish between factual and deliberative material." *Martin v. Office of Special Counsel, Merit Sys. Protection Bd.*, 819 F.2d 1181, 1187 (D.C.Cir.1987); *accord United Technologies Corp. v. N.L.R.B.*, 632 F.Supp. 776, 781 (D.Conn.1985) Therefore, factual work-product materials are immune from disclosure. *Id.* Lastly, the termination of litigation does not vitiate the protection afforded by the work-product doctrine under Exemption 5. *Federal Trade Comm'n v. Grolier, Inc.*, 462 U.S. 19, 28, 103 S.Ct. 2209, 2215, 76 L.Ed.2d 387, 395 (1983).

### iii. Deliberative Privilege

 The primary purpose of the deliberative process privilege is to encourage candid communications between subordinates and superiors. *Schell v. U.S. Dep't of Health & Human Servs.*, 843 F.2d 933, 939 (6th Cir. 1988). The ultimate goal of Exemption 5 is to prevent the quality of agency decision making from deteriorating as a result of public exposure. *Id.; see* H.R.Rep. No. 1497, 89th Cong., 2d Sess. 10, *reprinted in* 1966 U.S.C.C.A.N. 2418, 2427–28; *see also*

S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965).

 "To come within Exemption 5, a government document must be both 'predecisional' and 'deliberative.'" *Schell*, 843 F.2d at 940. A document is "predecisional" when it is received by the decision maker on the subject of the decision prior to the time the decision is made. *Id.* An Exemption 5 document does not automatically lose its predecisional character when a final decision is made. *See May v. Department of Air Force*, 777 F.2d 1012, 1014–15 (5th Cir.1985), *reh'g denied*, 800 F.2d 1402 (5th Cir.1986); *Cuccaro v. Secretary of Labor*, 770 F.2d 355, 358 (3d Cir.1985). In determining whether a document is predecisional, an agency does not necessarily have to point specifically to a final decision, but merely establish "what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 868 (D.C.Cir.1980). The Supreme Court has stated:

> Our emphasis on the need to protect the pre-*decisional* documents does not mean that the existence of the privilege turns on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared. Agencies are, and properly should be engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions and the lower courts should be wary of interfering with this process.

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. at 151 n. 18, 95 S.Ct. at 1517 n. 18 (emphasis in original).

A document is "'deliberative' when it reflects the give-and-take of the consultative process." *Schell*, 843 F.2d at 940. Courts have found that Exemption 5 applies to "recommendations, draft documents, proposals, suggestions and other subjective documents which reflect the personal opinions of the writer rather the policy of the agency." *Id.; see NLRB v. Sears Roebuck & Co.*, 421 U.S. at 150, 95 S.Ct. at 1516 (deliberative process privilege protects "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.").

 Unlike the work-product privilege, the deliberative privilege does not apply to purely factual investigative material, unless such factual material is selected or interpreted or otherwise so inextricably intertwined with the subjective opinion. *E.P.A. v. Mink*, 410 U.S. 73, 89–92, 93 S.Ct. 827, 837–38, 35 L.Ed.2d 119 (1973); *LSB Indus., Inc. v. Commissioner of Internal Revenue*, 556 F.Supp. 40, 45 (W.D.Okl.1982).

 Summary judgment is granted in the government's favor to protect the documents in paragraph 58 of the October 2, 1992 Stewart Declaration because they are protected by the work-product privilege. These documents include legal research, trial note books, intra-agency memoranda, analyses, charts, tables, drafts of court-filings and notes prepared by the Justice Department attorneys. Similarly, the draft of an affidavit which in its final version accompanied an application for various search warrants that were filed under seal is also protected.

Defendants assert that certain internal Department of Justice memoranda (hereinafter the "Justice Memoranda") were prepared by Justice Department attorneys in connection with litigation supervision. (Dec. 18, 1992 Stewart Decl. at ¶¶ 20–21.) Most of these documents were done in preparation for plaintiff's prosecution in *United States v. Manna*, Crim. No. 88–239. (*See Id.* at ¶ 20(b–f).) These documents, including the document in paragraph 20(a) which contains discussions of the legal strengths and weaknesses of the *Manna* prosecution, are protected by the attorney work-product privilege. In addition, the report dated October 12, 1966 (Dec. 18, Stewart Decl. at ¶ 22), the worksheets prepared for the indictment and prosecution (*Id.* at ¶ 23), and the draft affidavits also prepared by the attorneys (*Id.* at ¶ 25) are protected by the work-product doctrine.

The Justice Memoranda described in the December 18, 1992 Stewart Declaration at paragraph 20(b) are protected by the deliberative privilege because these documents were

prepared in order to obtain authorization for the original and superseding indictments in *United States v. Manna*, Crim. No. 88–239. These memoranda are also protected by Exemption 3 because they contain extensive transcriptions and analyses of Title III interceptions, as well as grand jury material.

The draft affidavits are also protected by the deliberative privilege because they were prepared in anticipation of an application for an order authorizing the interception of oral communications at Casella's Restaurant in Hoboken, New Jersey. (Dec. 18, 1992, Stewart Decl. at ¶ 25(a).) These affidavits are deliberative in nature because they were drafted for review and approval by the supervisor of the Organized Crime and Racketeering Section in Washington. (*Id.* at ¶ 26.)

The fifteen Case Initiation Reports ("CIRs") and their drafts as described in the December 18, 1992 Stewart Declaration in paragraphs 27–30 are protected from disclosure by the deliberative privilege, attorney-client privilege and work-product privilege. (Dec. 18, Stewart Decl. at ¶¶ 27–28.) A CIR describes, among other things, the subject of the proposed investigative action, the charges contemplated, a summary of known facts, the organized crime connection of the suspects, the basis establishing that connection and the prosecutors' objective. CIRs are prepared by Strike Force attorneys in order to receive proper authorization to proceed with the recommended investigative action.

In addition, the "dailys" which are internal reports prepared by field attorneys to the Organized Crime and Racketeering Section in Washington are protected by the deliberative process and the work-product doctrine because they report significant events concerning the course of each prosecution *i.e.* relevant informant information. (Dec. 18, Stewart Decl. at ¶ 28.) Lastly, the miscellaneous materials described in paragraph 31(a) and (c) in the December 18, 1992 Stewart Declaration are protected by the work-product privilege and the materials described in paragraph 31(b) is protected by the attorney-client privilege.

## B. VAUGHN INDEX

Plaintiff requests an index in accordance with *Vaughn v. Rosen*, 484 F.2d 820 (the "*Vaughn* index"). A *Vaughn* index is an itemized list compiled by the governmental agency which cross-references each withheld document (or portion) with a specific FOIA exemption and the relevant portion of the agency's nondisclosure justification. *Vaughn*, 484 F.2d at 827. There is no set formula for a *Vaughn* index; federal courts have explained that it is the function, not the form, which is important. *See, e.g., Hinton v. Department of Justice*, 844 F.2d 126, 128 (3d Cir.1988). A *Vaughn* index is a reasonable alternative to having the court perform an *in camera* review which may impose a significant burden on the court. *Hinton*, 844 F.2d at 128. The Third Circuit has stated that "[a]ll that is required ... is that the requester and the trial judge be able to derive from the index a clear explanation of why each document or portion of a document withheld is putatively exempt from disclosure." *Id.* at 129. The Third Circuit has further explained,

> [U]nder ordinary circumstances a *Vaughn* index ... will generally suffice to narrow the disputed issues and permit a reasoned disposition by the district court.... In both the ordinary and the exceptional case, *in camera* affidavits and submissions are authorized and the district court may resort to them in arriving at its ultimate determination. In both instances, the district court must have furnished to it, in whatever form, public or private, all of the detailed justifications advanced by the government for non-disclosure. The government must also give the court an opportunity to review all the materials which the government claims to be exempt, even though the decision whether to inspect these materials rests with the district court.

*Id.* (quoting *Lame v. United States Dep't of Justice*, 654 F.2d 917, 922 (3d Cir.1981)).

Courts have generally accepted the use of "coded" indices—in which agencies break certain FOIA exemptions into several categories, explain the particular nondisclosure rationales for each category, and then correlate

the exemption and category to the particular documents at issue. *See, e.g., Keys v. Department of Justice,* 830 F.2d 337, 349 (D.C.Cir.1987); *Albuquerque Publishing Co. v. Department of Justice,* 726 F.Supp. 851, 859 (D.D.C.1989).

A district court has discretion to accept sufficiently detailed affidavits from the government in lieu of an index. *Currie v. I.R.S.,* 704 F.2d 523 (11th Cir.1983). "Without evidence of bad faith, the veracity of the government's submissions regarding reasons for withholding the documents should not be questioned." *Matter of Wade,* 969 F.2d 241, 246 (7th Cir.1992) (citing *Silets v. United States Dep't of Justice,* 945 F.2d 227 (7th Cir.1991) *(en blanc) cert. denied,* — U.S. ——, 112 S.Ct. 2991, 120 L.Ed.2d 868 (1992). The affidavits provided here are sufficiently detailed such that a *Vaughn* index is not warranted. Moreover, plaintiff's request for a *Vaughn* index must be denied because submission of a detailed *Vaughn* index may present the same risks that production of the underlying documents presents. *See Manna v. Department of Justice,* Civ. No. 92–1840, slip op. at p. 3 (citing *Lewis v. IRS,* 823 F.2d 375, 380 (9th Cir. 1987)). Accordingly, plaintiff's motion for a *Vaughn* index is denied.

Summary judgment is granted with respect to all the documents defendants seek to withhold except with respect to the documents in the Turner Declaration. Defendants are invited to reapply for protection of these documents with their future motion for summary judgment with respect to any documents discovered subsequent to defendants' application now before the court.

### C. ADEQUACY OF SEARCH

Plaintiff challenges the adequacy of the searches performed by agency officials in response to his FOIA request. "[A]n agency responding to a FOIA request must 'conduct[ ] a search reasonably calculated to uncover all relevant documents'". *Truitt v. Department of State,* 897 F.2d 540, 542 (D.C.Cir.1990) (quoting *Weisberg v. U.S. Dep't of Justice,* 227 U.S.App.D.C. 253, 260, 705 F.2d 1344, 1351 (D.C.Cir.1983)). "'The issue is *not* whether any further documents

might conceivably exist but whether the government's search for responsive documents was adequate.'" *Id.* (emphasis in original). An agency "must demonstrate 'beyond material doubt' that the search was reasonable." *Truitt,* 897 F.2d at 542.

When determining whether an agency's FOIA search was reasonable, courts may rely on agency affidavits, provided that the affidavits are relatively detailed, nonconclusory and submitted in good faith. *Perry v. Block,* 684 F.2d 121, 126 (D.C.Cir.1982). The affidavits of the responding agency need not set forth with meticulous documentation the details of an epic search for the requested records. *Id.* at 127. "Rather, in the absence of countervailing evidence or apparent inconsistency of proof, affidavits that explain in reasonable detail the scope and method of the search conducted by the agency will suffice to demonstrate compliance with the obligations imposed by the FOIA." *Id.* When determining whether the search has been adequate, "a reviewing court must thus determine whether the materials submitted by the agency satisfactorily demonstrate the apparent adequacy of the search conducted." *Id.* Only when the agency's responses "raise serious doubts as to the completeness of the search or are for some other reason unsatisfactory" will granting summary judgment in the agency's favor usually be inappropriate. *Id.; accord Truitt,* 897 F.2d at 542.

The Declarations of Evelyn Block fully set forth the scope and methodology of defendants' search. *(See* Nov. 19, 1992, Dec. 18, 1922 Declarations of Evelyn F. Block.) First a computer search was done on a tracking system entitled "PROMIS" (An acronym for *Prosecutor's Management Information System).* The declarations provide the search terms used and the results found. (Nov. 19, 1992 Block Decl. at ¶¶ 9–13.). In addition, the Block Declarations explain the types of files found and the follow-up procedures employed. (Dec. 18, 1992 Block Decl. at ¶ 2; Feb. 1, 1993 Block Decl. at ¶ 2.) Defendants also searched three other indices which were non-computerized and in the form of "index cards." (Nov. 19, 1992 Block Decl. at ¶¶ 14–15; Dec. 18, 1992 Block Decl.

at ¶ 4.) District courts have held that FOIA responsibilities can be satisfied by searching general indices maintained on index cards. *See, e.g., Friedman v. F.B.I.,* 605 F.Supp. 306, 310–11 (N.D.Ga.1981); *Stern v. United States,* No. 77–3812–C (D.Mass. Aug. 25, 1980). The Block Declarations expound on what was found using these indices and any follow-up that was performed. (Nov. 19, 1992 Block Decl. at ¶¶ 14–16; Dec. 18, 1992 Block Decl. at ¶¶ 4–6; Feb. 1, 1993 Block Decl. at ¶¶ 3–5). Defendants are in the process of completing their search and anticipate submitting a motion for summary judgment with respect to any documents found subsequent to the motion now before the court.

Although defendants concede that they have not completed their search in response to plaintiff's FOIA request, (Dec. 18, at ¶ 6), the defendants have met their burden by demonstrating beyond a material doubt that the search methodology employed was reasonable. The declarations of Virginia L. Wright details how plaintiff's FOIA request has been handled since its inception. (*See* Oct. 1, 1992 and Dec. 17, 1992 Declarations of Virginia L. Wright.) The Wright Declarations provide the FOIA search results, a chronology of their correspondence between plaintiff and defendant and a copy of the correspondence. The Wright Declarations also state that plaintiff was informed that by paying a duplication fee he could obtain a copy of the non-privileged material the agency had on file. Hence, defendants' search was responsive and adequate under the FOIA.

## CONCLUSION

Defendants' motion for partial summary judgment is granted in its entirety except with respect to the information described in the Turner Declaration. Defendants may resubmit their application regarding this information as directed within this opinion. Plaintiff's cross-motion for summary judgment is denied and plaintiff's cross-motion for a *Vaughn* index is also denied.